**Marcus ARDREY, James Cherry, Bessie Easterling, et al., Plaintiffs,**

v.

**UNITED PARCEL SERVICE, Defendant.**

**No. C–C–82–323–P.**

United States District Court, W.D. North Carolina, Charlotte Division.

Aug. 19, 1985.

Michael A. Sheely, Sheely & Brooks, Charlotte, N.C., for plaintiffs.

William W. Sturges, Weinstein, Sturges, Odom, Groves, Bigger, Jonas & Campbell, P.A., Charlotte, N.C., for defendant.

## ORDER

ROBERT D. POTTER, Chief Judge.

The Plaintiffs filed this action on May 20, 1982 alleging they were discriminated against by the Defendant because of race, sex, and age in violation of 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981 (Section 1981) and 29 U.S.C. § 621 *et seq.* ("ADEA"). By Order of April 9, 1984 the ADEA claims were dismissed. The trial was heard before the undersigned on November 26, 27, 28, and December 21, 1984 in Charlotte, North Carolina. The Plaintiffs were represented by Michael A. Sheely and the Defendant was represented by William W. Sturges. After a full trial of the matter, the Court, having carefully considered the testimony and exhibits, enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

(1) The Defendant, United Parcel Service ("UPS") is a corporation engaged in the interstate transportation of parcels. It employs in excess of fifteen employees and is an "employer" within the meaning of 42 U.S.C. § 2000e(b) and a "person" within the meaning of 42 U.S.C. § 1981.

(2) Local Union No. 71 of the Teamsters is the bargaining agent at UPS for the bargaining unit in which the majority of the Plaintiffs are members. The positions covered by the collective bargaining agreement include package car drivers, feeder drivers, part-time loader/unloaders, sorters, car washers, mechanics, and building maintenance. The policy of UPS in reference to full-time bargaining unit positions provides that for every three openings two openings would be filled by part-time bargaining unit employees and the third opening would be filled from the street.

(3) There are twelve Plaintiffs in this litigation who were all employed at the West Carolina District of UPS. This district encompasses the western part of North Carolina and all of South Carolina.

(4) The Plaintiff, Marcus Ardrey, a black male is currently employed by UPS as a full-time car washer shifter. He asserts claims of racial discrimination in the denial of package car driver position and preloader position.

(5) The Plaintiff, James Cherry, a black male, is currently employed by UPS as a full-time package car driver. He asserts claims of racial discrimination in the denial of a preloader position and in the issuing of warnings to him. In addition, he claims the warnings were issued in retaliation for his opposition to practices illegal under Title VII.

(6) The Plaintiff, Bessie Easterling Brown, a black female, is currently employed by UPS as a feeder driver. She alleges racial discrimination in the issuance of warnings to her, the denial of time off, her one day discharge and her general treatment by the supervisors.

(7) The Plaintiff, Lewis Funderburk, a black male, is currently employed by UPS as a feeder driver. He alleges racial discrimination in the assignment of feeder driver equipment.

(8) The Plaintiff, Horace Jenkins, a black male over forty, was formerly[1] employed by UPS as a package car driver. He alleg-

es age and racial discrimination in the denial of light duty work, the removal of the responsibility of "call tags" and "one shots" and the assignment of equipment. His ADEA claim has already been dismissed and summary judgment in favor of UPS was granted on his light duty claim.

(9) The Plaintiff, Joyce Massey, a black female, was formerly employed by UPS as a part-time simulator. She alleges sex and race discrimination in her discharge after she was laid off by UPS. She was not a member of Local Union No. 71.

(10) The Plaintiff, Eugene Neal, a black male, is currently employed by UPS as a feeder driver. He alleges racial discrimination and retaliation in the denial of a supervisor position and in assigning overtime work. He further testified that racial discrimination exists in the assignment of feeder driver equipment.

(11) The Plaintiff, Matthew Smith, a black male, is currently employed by UPS as a feeder driver. He alleges racial discrimination in the assignment of feeder driver equipment and the issuance of warnings and suspensions.

(12) The Plaintiff, Carl Watts, a black male, is currently employed by UPS as a part-time loader. He alleges racial discrimination in the denial of a package car position and in the issuance of warnings.

(13) The Plaintiff, Cheryl Pettigrew, a black female, was formerly employed by UPS as a tracer clerk. She alleges racial discrimination in her treatment by her supervisor, her training and her subsequent discharge.

(14) The Plaintiffs, Jerome Morrow and Henry Tyson, black males, are currently employed by UPS as full-time car wash shifters. They allege racial discrimination by having to work in a racist atmosphere.

(15) All of the Plaintiffs allege racial discrimination by being subjected to work in a racist atmosphere.

(16) All of the Plaintiffs filed a timely charge with the Equal Employment Oppor-

---

1. There is a pending EEOC charge about Mr. Jenkins' possible reemployment in 1984. The charge is still pending before the EEOC and is not included in this litigation.

tunity Commission ("EEOC") and exhausted their administrative remedies.

## A. ARDREY—PACKAGE CAR DRIVER

(1) On April 7, 1980 Mr. Ardrey applied for a full-time package car position. His application revealed he was convicted on July 16, 1979 of a DUI and his license was suspended for six months.

(2) Applicants for driving jobs must meet designated pre-qualification requirements before they are accepted as candidates to qualify as drivers. One of these requirements is that an applicant must have an acceptable driving record for the past three years. Such a record has been defined as one that does not have a license suspension or revocation within the past three years for, among other reasons, driving under the influence.

(3) Mr. Ardrey was denied the opportunity to qualify for a driving job because he did not have an acceptable driving record for the preceding three years because of the DUI conviction.

There is not any evidence that any white person was allowed to qualify without meeting the three year clean record requirement. Mr. Ardrey does not contend that the Company's failure to qualify him because of his DUI was a pretext for discrimination.

(4) Mr. Ardrey complains because he was mistakenly told by two white management employees that it was only two years. Mr. Johnson, a black supervisor, told Mr. Ardrey that it was three years. It is not clear why Mr. Ardrey contends the mistake is suppose to correlate to race.

██ (5) The Court finds that Mr. Ardrey failed to show that in applying for the package car position he was treated differently because of his race. (*The Plaintiff's Proposed Findings of Fact* also state that Mr. Ardrey failed to prevail on this claim.)

## B. PRELOADER—ARDREY AND CHERRY

### 1. *Ardrey's Training*

(1) Mr. Ardrey was hired by UPS in August 1973 as a part-time trailer unloader.

He was in the military between August 1975 and August 1979. In October 1979 he returned to UPS as a part-time unloader.

(2) On February 11, 1980 Mr. Ardrey began training for a full-time preloader position on the sortrac. The qualification period is thirty days.

(3) The sortrac is a 250 feet long conveyor belt with twelve slides on each side of the conveyor belt. Belts carry packages which are diverted down the slides for loading into package vans. There are approximately forty package cars parked on each side at the end of the slides for loading. The slides are eight to ten feet long and ten feet wide. The higher end of the slide is about five and a half feet and the lower end is about three feet. There are return conveyor belts beneath the slides.

(4) Preloaders also work in the "boxline" area which is next to the sortrac. Packages in the boxline are delivered to the preloaders by being placed in cages which are on a continually running conveyor belt. The parties disagree as to what is the easiest area to work on the sortrac.

(5) The keyers divert packages to the slides and cages. A package which is incorrectly keyed and does not belong on a slide is a missort or miskey.

(6) Ken Hudson, a white male, supervised six employees on one side of the sortrac and Jim Stone supervised the employees on the other side. Mr. Hudson's immediate supervisor was Rich Young, the sortrac manager.

(7) Mr. Ardrey's qualification supervisor was Ken Hudson. Mr. Ardrey was assigned slides A–54 and A–25, side by side in the sortrac area.

(8) The job of preloader is to remove the packages from the slide and load them in the designated locations inside the package cars. There were three to four vans assigned to each slide. The packages were placed in the package cars in terms of a sequence determined by the route of the package car. A "sequence chart" established the order. A "sequence number" was determined by an address. Certain

customers, due to their volume, receive sequence numbers. Eighty percent of the packages loaded on the cars are placed within twenty percent of the sequence numbers in the car. The sequence chart was a computer print out which was usually received daily at the beginning of the shift. The sort work hours were from 11:00 p.m. to 8:00 or 8:30 a.m.

(9) UPS implemented standard training programs for training employees attempting to qualify for the various positions. Each training program was designed for the needs of the particular position.

(10) UPS utilized a standard training program for training preloaders. At the completion of the training period the employee is required to meet an established minimal level of competency in order to be qualified (receive seniority) as a preloader.

(11) To attain seniority as a preloader the employee must meet at least a 200 package production rate at the end of his training period. There was not any evidence that any employee, black or white, was allowed to gain seniority as a preloader without satisfying this 200 package set level of competency.

(12) Mr. Ardrey failed to meet the 200 package quota and therefore was not allowed to qualify as a preloader. Mr. Ardrey testifies that he was unable to satisfy the requirement because he received inferior training and harder assignments because of his race.

(13) Mr. Ardrey testified that his training was sparse and that the only training he received was on "stop count" and "off load" of packages. This training was received during the first three days of his qualification period. Although Mr. Ardrey conceded that he received help from other employees when his belt jammed, he contended that the help was "late" and caused Mr. Ardrey to lose his production level since efforts would be spent in clearing the slides. Mr. Ardrey further testified that training on slides A-54 and 25 was more difficult because these slides were at the beginning of the main belt and were more likely to jam. Each time the belt jammed packages not belonging in the A-54 and 25

slides were pushed on the slides which would slow Mr. Ardrey's production. Mr. Ardrey, in addition, testified that he knew the A-54 slide chart "pretty well". He was tested twice on his chart knowledge and only scored 30% on each test. Finally, Mr. Ardrey testified that he received more missorts and miskeys than white trainees and was not promptly informed of added or deleted stops during his shift.

(14) UPS contends that Mr. Ardrey received the same training, assistance and opportunity to qualify as any other employee, black or white. On Mr. Ardrey's first day of training he received orientation on personnel matters from Martin Taylor. Mr. Ardrey began his on-the-job training the second day. This training involved personal training in all aspects of the job by Mr. Hudson. The same training was repeated the next day. Mr. Hudson testified that he spent approximately 70% of his time with Mr. Ardrey during these initial two days.

(15) On the fourth day Mr. Ardrey received his first sortrac trainee evaluation by Mr. Hudson. At this time Mr. Ardrey was only loading the A-54 area. Mr. Hudson reviewed this evaluation with Mr. Ardrey. Mr. Hudson rated Mr. Ardrey good in attendance, attitude, follows instructions, and parcel knowledge. He was rated fair in production, retention, personal safety and knowledge of job. At this time Mr. Ardrey was averaging eighty-five pieces per hour which is average progress at this stage. Mr. Hudson recommended that Mr. Ardrey become more familiar with 80/20 (chart) knowledge. This evaluation is documented by a contemporaneously written evaluation signed by Mr. Ardrey (Def.Ex. 13).

(16) On the fourth day another written evaluation was prepared, which evaluation is signed by Mr. Ardrey. It states that Mr. Ardrey needs to become more aggressive and enthusiastic, although his lack of enthusiasm is in part due to his lack of job knowledge. The evaluation further provides that his attitude, retention, service, and personal safety is good, he follows

instructions well and his production is acceptable. (Def.Ex. 14).

(17) On his fifth training day, Mr. Ardrey was evaluated on his slide to car methods. These methods involve essentially activities at the slide pre-sorting packages so that optimum carries can be made in loading the package cars and activities within the car in shelving the packages properly. In the slide to car evaluation Mr. Ardrey received a good in the majority of the categories. Mr. Hudson, however, stressed that Mr. Ardrey needs to improve his speed, chart knowledge, and optimum carries. This evaluation was documented and signed by Mr. Ardrey. (Def.Ex. 15).

(18) Mr. Ardrey's average package per hour rate at the end of his first week was eighty-three packages. This end-of-the-week progress report is documented. (Def.Ex. 16).

(19) On February 18, 1980 Mr. Ardrey was given a written 80–20 chart knowledge test. Mr. Ardrey scored 30% on the test. This test is documented and signed by Mr. Ardrey. (Def.Ex. 17). After the test, Mr. Hudson counseled Mr. Ardrey that UPS expected 200 packages per hour in order to gain seniority and that he should be able to handle A–54 the first week without problems because the second week A–25 would be added and A–88 would be added the third week. Further, Mr. Hudson reviewed his current production level and reviewed where he needed to be week by week. Mr. Hudson told Mr. Ardrey that he must study and learn the 80–20 charts given to him. This counseling was documented in Mr. Ardrey's file. (Def.Ex. 18). (Def.Ex. 20).

(20) On February 19, 1980 Mr. Hudson worked with Mr. Ardrey for eight hours reviewing the preload procedures and good methods. Mr. Hudson worked with Mr. Ardrey to demonstrate the work pace needed to reach the established goals. Mr. Ardrey replied that this pace "was killing him." Mr. Hudson prepared a written report documenting this training. (Def.Ex. 19).

(21) In addition, on February 19, 1980 Mr. Young (the preload manager) performed a slide to car evaluation on Mr. Ardrey. Mr. Young observed that Mr. Ardrey's chart knowledge was insufficient at 56%, that he was not selecting packages for optimum carries to one car and that his work pace lacked a sense of urgency or aggressiveness. The evaluation was documented and signed by Mr. Ardrey.

(22) On February 20, 1980 Mr. Hudson performed the second sortrac trainee evaluation, day nine. Mr. Ardrey was rated good in attendance, retention, personal safety, following instructions, and parcel handling. His attitude and job knowledge was fair. It was recommended that he needed to improve his speed and chart knowledge. In fact, his package per hour rate was still at eighty-five, having not increased at all over his first week's rate. This evaluation was documented and signed by Mr. Ardrey. (Def. Ex. 21).

(23) On February 22, 1980 Mr. Hudson worked with Mr. Ardrey on using better methods for space utilization within the car. Mr. Hudson demonstrated the proper procedure for adjusting shelves and moving steps on the shelves for maximum utilization of existing shelf space. This training was documented by Mr. Hudson. (Def.Ex. 23).

(24) In addition, on February 22, 1980, Mr. Hudson performed the tenth day, slide to car evaluation of Ardrey. Mr. Ardrey was rated good to very good in many areas. His package per hour rate, however, was only 96% and he had to refer to the chart eight out of sixteen times. He was told that he needed to improve his pre-sorting and that his chart knowledge "reveals a great need for improvement. Chart knowledge from observation shows little or no chart knowledge." This evaluation was documented and signed by Mr. Ardrey. (Def.Ex. 24).

(25) On February 25, 1980 Mr. Young completed the center manager's review with pre-seniority employee. Mr. Young found Mr. Ardrey to be strong in personal safety and stop for stop training. He was found to be weak in speed, chart knowledge, stop count accuracy and production.

Although his production level should have been 150 packages per hour at this time it was only ninety-eight. He was advised that he needed to improve his speed in loading and should be able to load the area without help at this juncture. This review was documented and signed by Mr. Ardrey. (Def.Ex. 25).

(26) Mr. Hudson performed the third sortrac evaluation and commentary, day fifteen, of Mr. Ardrey on February 28, 1980. Mr. Ardrey was rated good in attendance, personal safety, following instructions, and handling parcels. He was rated fair in attitude, production, retention and job knowledge. Mr. Ardrey's production level was only 100 packages per hour. Mr. Hudson told Mr. Ardrey that he needed to study the charts and increase his speed and chart knowledge. Further his production needed "drastic improvements". This evaluation was documented by Mr. Hudson. (Def.Exs. 26, 27).

(27) On February 29, 1980, his sixteenth day, Mr. Ardrey received his third slide to car evaluation. Mr. Ardrey continued to be rated good to very good in the same areas and his space utilization had improved. He, however, continued to be deficient in chart knowledge and speed. He was advised his chart knowledge was less than it should be and that he needed to improve this deficient chart knowledge by studying his 80–20 sheets. If his speed and knowledge were not increased he would never be able to progress to the A–25 slide. This evaluation was documented by the Defendant. (Def.Ex. 28).

(28) On Mr. Ardrey's seventeenth training day, Mr. Young with the assistance of Mr. Hudson conducted a center manager's review with pre-seniority employee about Mr. Ardrey. Mr. Ardrey's strong area was stop for stop loading. His weak areas were counts, wrap up, and work rate. Mr. Ardrey's actual production rate was 114 packages per hour, significantly below the 200 planned production level. Mr. Ardrey was advised that he needed drastic improvement in his wrap up, stop counts and work rate by March 8, 1980 or he would not gain seniority. This evaluation was documented and signed by Mr. Ardrey.

(29) On his twentieth training day Mr. Ardrey received his final sortrac trainee evaluation. His attendance, personal safety, following instructions, handling parcels and job knowledge was rated good. His attitude and retention was found to be fair. His production rating was poor. His production rate had dropped to eighty-nine considerably below the 175 to 200 piece per hour plan rate. The evaluation was documented by Mr. Hudson. (Def.Ex. 30).

(30) Mr. Hudson also prepared a final slide to car evaluation. Mr. Ardrey continued to receive good ratings in the same areas and his space utilization was greatly improved. He, however, continued to have a serious problem with chart knowledge. He was given an 80–20 test and only scored 30%. In observation Mr. Hudson found that Mr. Ardrey handled seventy-two packages per hour with only 33% chart knowledge. His low level of production was due to his lack of chart knowledge. Mr. Hudson documented this evaluation. (Def.Exs. 32, 34).

(31) Mr. Hudson's final pre-seniority evaluation of Mr. Ardrey on March 11, 1980 concluded that Mr. Ardrey's attitude seemed less than eager, that he failed to study the 80–20 study sheets and as a result his production was hampered. Mr. Hudson did not recommend Mr. Ardrey for seniority. This evaluation was documented by Mr. Hudson. (Def.Ex. 33).

(32) On March 11, 1980 Mr. Hudson prepared a detailed memorandum summarizing his reasons for not being able to recommend Mr. Ardrey for seniority. The memorandum in part provides:

> The reasons for not wrapping up are due in part to a long standing lack of chart knowledge. This is upheld by the test scores of the 80–20 study sheets. This in itself has hampered Marcus from becoming qualified in this particular area. I feel with the lack a [sic] aggressiveness to study these sheets and become familiar with his work area has greatly decreased his chance of becoming a seniority employee.

The aggressiveness that should be present with a pre-senior employee seemed lacking in Marcus. I feel greatly that Marcus has the ability to become a preloader if he wants to. But, without the effort and enthusiasm to pursue the requirements of the job he has fallen short of his recommended levels of production.

Marcus has only reached an average production rate of around 114 pieces per hour. At this rate he will never be total [sic] capable of loading this assigned area.

Due to the above on this 23rd day of pre-seniority, I personally do not recommend Marcus Ardrey for gaining seniority in my operation.

(33) On March 12, 1980 Mr. Hudson prepared a "Synopsis of Work Performance" regarding Mr. Ardrey. After describing Mr. Ardrey's failure to attempt to learn the charts, Mr. Hudson noted

These factors alone show that Marcus was determined to perform by his standards rather than perform by the expectations of myself. He presented himself as if he were going to qualify in his own terms.

I feel attitude and mispeculation [sic] of our operation was the major problem that lead to his disquaification. I also feel Marcus did not have any idea that we could disqualify him.

(Def.Ex. 36 B).

(34) On March 12, 1980 Mr. Young, Mr. Hudson and Mr. Ardrey met to discuss Mr. Ardrey's status. Mr. Young asked Mr. Ardrey how he felt his progress was as a pre-sorter. Mr. Ardrey replied "that his progress was about the same as day one." Mr. Ardrey was advised that he was being disqualified from the sortrac. He responded that he had never heard of anyone being disqualified from the sortrac. Mr. Young informed Mr. Ardrey that although in the past preloaders had not been properly trained, within the past six months UPS had set these basic requirements for all new preloaders. Since that time some employees had qualified and some had not qualified, depending on whether they met the requirements in the pre-seniority training. This meeting is documented. (Def.Ex. 36 A).

(35) After Mr. Ardrey's disqualification he was returned to a part-time position with UPS.

(36) On March 19, 1980 Mr. Ardrey filed a grievance with the union contesting his disqualification from the sortrac. The grievance does not mention or even allude to improper treatment because of his race. Mr. Ardrey claimed that UPS used improper procedures ·for qualifying employees, which standards have not been agreed upon by Local 71. Mr. Ardrey felt that the requirements were unfair because UPS was requiring loading standards higher than those required of full-time qualified employees. (Def.Ex. 1).

(37) Mr. Ardrey stated that the union grievance was settled by allowing him and Mr. Cherry to try and qualify for the next full-time job on the sortrac without waiting one year, which wait is normally required when an employee is disqualified from a job.

(38) After the settlement of the grievance Mr. Ardrey was offered a full-time car wash job, which job he refused to accept. Thereafter, Mr. Ardrey filed another grievance claiming that UPS did not abide by the settlement terms of the first grievance. (Def.Ex. 2). Mr. Ardrey did not prevail on his second grievance. He was not offered another opportunity to qualify on the sortrac nor was he offered another full-time position in settlement of the first grievance.

### 2. *Cherry's Training*

(1) James Cherry was hired by UPS in August 1973 into a bargaining unit position of part-time unloader. In this litigation he complains that he was disqualified in his attempt to qualify as a preloader on the sortrac because of his race in violation of 42 U.S.C. § 1981. He did not file an EEOC charge covering this allegation.

(2) Mr. Cherry began training for a full-time preloader job on the sortrac on January 7, 1980.

(3) His training supervisor was Mr. Hudson and his area supervisor was Mr. Young. He was trained on the slides for areas 54 and 25. He was trained by the same supervisors and trained on the same slides as Mr. Ardrey. Mr. Cherry's qualification period also was for thirty working days, under the same standard training program.

(4) On January 7, 1980 Mr. Cherry was given the orientation on personnel matters by Martin Taylor (Def.Ex. 109).

(5) On January 10, 1980 Mr. Hudson gave Mr. Cherry his first sortrac trainee evaluation, day four. The evaluation reports that Mr. Cherry is enthusiastic, very aggressive, has a good attitude, follows instructions well, and is very service minded. His weaker areas were knowledge of the job, his speed and his production. This evaluation is documented and signed by Mr. Cherry. (Def.Ex. 110, 111).

(6) On his fifth day, Mr. Cherry was evaluated on his slide to car methods. In this evaluation, Mr. Cherry was found to have a good pre-sort, car and post sort routine. He, however, needed to improve his speed in loading which was slow due to his lack of chart knowledge and having to constantly refer to the charts. This evaluation is documented and signed by Mr. Cherry. (Def.Ex. 112).

(7) On the fifth day, Mr. Hudson also performed a productivity evaluation. Mr. Cherry's planned production rate was 125 packages per hour. His actual rate was ninety-four packages per hour. Mr. Hudson recommended that Mr. Cherry should improve his chart knowledge which would result in an increase in his package per hour rate. This evaluation is documented and signed by Mr. Cherry. (Def.Ex. 113).

(8) On January 15, 1980, Mr. Cherry's progress was reviewed. Mr. Cherry, after six days, was not able to slide area 54 without any help, even though he received extensive training for three days and had received training each day thereafter. It was stressed to him that by the end of the week he should be able to load areas 54 and 25 without help. He was told that he would be given an 80–20 test the next day for which he should study and that UPS expected to witness some improvement by January 18, 1980 or he would be disqualified. This review is documented. (Def.Ex. 114).

(9) The following day Mr. Cherry correctly answered only one out of the eleven questions on the 80–20 test. (11%). The test covered slide A–54. (Def.Ex. 118).

(10) The test results were thought to reflect the major problem that Mr. Cherry had in his work area. Again, it was stressed to him that if his performance did not increase by Friday he would be disqualified. This review is documented. (Def.Ex. 115).

(11) On Mr. Cherry's ninth day of training, Mr. Hudson prepared the second sortrac evaluation and commentary. Mr. Cherry received a good in attendance, attitude, personal safety, following instructions and parcel handling. His production rate, however, was only at ninety pieces per hour. Thus he only received a fair rating in production, retention and job knowledge. This report is documented. (Def.Ex. 116).

(12) On the day nine commentary Mr. Cherry was found to be enthusiastic, aggressive, service minded, and showing improvement. His production level, however, still was not on an acceptable level and needed improvement. This commentary is documented. (Def.Ex. 117).

(13) On January 18, 1980 Mr. Cherry took an 80–20 test for area 54 on which he scored 90%. Mr. Hudson recommended, in light of his reasonable progress, that he not be disqualified. Mr. Hudson did qualify his recommendation by noting that Mr. Cherry "has a long way to go to become qualified as a seniority employee." (Def.Ex. 119).

(14) On Mr. Cherry's tenth day of training he met with Mr. Young and Mr. Hudson to review his progress. By then Mr. Cherry had attained a production rate of 115 packages per hour. It was agreed that

Mr. Cherry would have to attain a goal of 175 packages per hour by January 25, 1980 and that he would have to handle areas 54 and 25 without assistance. Area 88 would be added the following week so he could attain 200 packages per hour. Mr. Cherry indicated that these goals seemed reasonable and that he could attain them. He was encouraged to put some extra effort in learning the sequence numbers from the 80–20 charts. This meeting was documented. (Def.Ex. 121).

(15) On the January 21, 1980 slide to car evaluation Mr. Cherry continued to receive positive remarks on his pre-sort, car and post sort procedures. He, however, was slow to develop his chart knowledge, which knowledge along with package per hour rate and wrap up needed drastic improvement. This evaluation is documented. (Def.Ex. 122).

(16) The second productivity evaluation revealed that Mr. Cherry's actual package per hour rate was only seventy-seven, compared to the planned rate of 105. It was recommended that if he improved his chart knowledge his overall production rate would improve. This evaluation is documented and signed by Mr. Cherry. (Def.Ex. 123).

(17) On his second chart test Mr. Cherry scored 100%. Despite this good score, when he worked he continued to refer to the charts too much which hindered his production rate. He still was not able to manage areas 54 and 25. This evaluation is documented. (Def.Ex. 125).

(18) On January 22, Mr. Cherry scored 80% on the chart test. (Def.Ex. 126).

(19) On January 23, 1980 Mr. Hudson reported to Mr. Young that Mr. Cherry had not yet been able to load slides A–54 and A–25. His 80–20 test scores had improved but his overall production rate was too low for this stage of training. He was still referring to his charts too much. Mr. Hudson reported that Mr. Cherry would have to make considerable gains in his work pace to qualify. This report is documented. (Def.Ex. 127).

(20) On January 25, 1980 Mr. Young performed a slide to car evaluation of Mr. Cherry. He found an improvement in Mr. Cherry's knowledge. Mr. Cherry, however, was using improper selection methods so he would load only the packages he knew. Mr. Young was of the opinion that this caused Mr. Cherry to end up at the end of his shift with all the packages he did not know. Further, Mr. Cherry was not carrying optimum loads to the package cars. On eight occasions he carried more than one package. On thirty-one occasions, however, he carried only one package. This evaluation is documented. (Def.Ex. 128).

(21) On Mr. Cherry's fifteenth day of training, Mr. Hudson prepared the third sortrac trainee evaluation. Mr. Cherry continued to receive good ratings in all of the categories except production and retention. His production rate was at 110 pieces per hour. This evaluation is documented and signed by the Plaintiff. (Def.Ex. 129).

(22) Mr. Cherry's third slide to car evaluation was prepared by Mr. Hudson. He continued to receive positive ratings on his pre-sort, car and post sort procedures. He, however, still needed to improve his chart knowledge and to carry optimum loads. In loading thirty packages he had to refer to the chart eleven times. This report is documented and signed by Mr. Cherry. (Def.Ex. 130).

(23) In the sortrac commentary Mr. Hudson found Mr. Cherry to be aggressive, enthusiastic and very service minded but he needed to improve his production. This commentary is documented. (Def.Ex. 131).

(24) On January 28, 1980 Mr. Cherry received his third productivity evaluation. He loaded thirty packages in ten minutes. Mr. Hudson remarked that Mr. Cherry needed to improve his optimum carries and thus increase his package per hour rate. His total productivity rate needed to be much higher. This evaluation is documented. (Def.Ex. 132).

(25) On his twentieth training day, Mr. Hudson performed the final sortrac trainee evaluation. His package per hour rate was only at 100 packages and thus he received a poor rating on production. His produc-

tion was far below where it should have been at 200 packages per hour. This evaluation is documented and signed by the Plaintiff. (Def.Ex. 133).

(26) On the final sortrac commentary Mr. Cherry received good ratings except as to his production which was rated poor at 100 packages per hour. This final commentary is documented (Def.Ex. 134).

(27) Mr. Cherry's production during the week ending February 2, 1980 ranged from a high of 133 packages per hour to a low of ninety-four packages per hour. This range was far below the 200 package per hour planned rate. This week average evaluation is documented. (Def.Ex. 135).

(28) The final productivity evaluation of Mr. Cherry on his twenty-second day of training found his actual production at 111 packages per hour. Mr. Hudson noted that without an improvement of eighty-nine packages by Friday, Mr. Hudson would not be able to recommend Mr. Cherry for seniority. This evaluation is documented. (Def.Ex. 136).

(29) On the final slide to car evaluation dated February 5, 1980 Mr. Hudson rated Mr. Cherry very good on pre-sort, slide and post sort procedures. In summarizing his performance, however, he stated that Mr. Cherry's production is poor, he needs improvement and he has reached a stalemate in his progression. This final evaluation is documented. (Def.Ex. 138).

(30) On Mr. Cherry's final pre-seniority evaluation Mr. Hudson did not recommend him for seniority because of his low productivity. The evaluation provides that:

James has tried hard—very hard and has been very good in all stop for stop service audits in this period. James' biggest problem is his productivity. He is slow is [sic] organization and performance of job function.

(31) The following day, Mr. Young and Mr. Hudson met with Mr. Cherry to discuss his progress. Mr. Young told Mr. Cherry that his progress was not satisfactory on his twenty-third day of his thirty day training program. Mr. Cherry seemed to be stuck at the 100 to 110 package per hour level. Mr. Cherry was reminded that 200

packages per hour was required for seniority. He was advised that basically he was being held back by spending too much time on the slide selecting packages and not having enough optimum carries. Mr. Young further told Mr. Cherry that he would observe his work later during the shift and that by Friday, February 8, 1980 he needed to be loading 200 packages per hour and handling slides 54 and 25 without any help in eight hours.

Mr. Cherry stated that he thought the problem was too many miskeys. Mr. Young told him that the 200 package per hour rate took into account the work required by miskeys and that Mr. Cherry should stack his miskeys for Mr. Young and Mr. Hudson to inspect. This meeting is documented. (Def.Ex. 139).

(32) Later during the shift Mr. Young performed a slide to car evaluation of Mr. Cherry. In the sixteen minute observation Mr. Cherry handled fifty-two packages which equals a production rate of 195 packages per hour. Mr. Young found that Mr. Cherry did not sort quickly and efficiently on the slide and that 50% of his loads were single carries. Again, the single carries reflected the fact that Mr. Cherry was selecting packages with familiar sequence numbers in order to increase his chart knowledge rating. The miskey rate was only 3.5%. This slide to car evaluation is documented. (Def.Ex. 140).

(33) During Mr. Cherry's last week of training his actual package per hour rates were 145, 99, 116 and 134. His highest actual package per hour rate during his entire training period never exceeded 145. His actual package per hour rates for his last week and for his entire training period are documented. (Def.Exs. 142, 143).

(34) On February 8, 1980 Mr. Young, Mr. Hudson, and Mr. Cherry met to assess Mr. Cherry's standing after twenty-five days of training. They compared Mr. Cherry's actual performance to the stated requirements. In that Mr. Cherry had failed to meet the standard of 200 packages per hour he was advised he was being disqualified for lack of performance.

Mr. Cherry's reaction to this was with self disappointment and a plea for reconsideration. We told him that his time had ran [sic] out for reconsideration, that we had extended his time five days already with hopes things would work out for him.

We told James, we felt he had tried hard and had given us good effort these past weeks. Although, we have certain expectations of presenior people and we cannot vary from those expected standards. All presenior people have to achieve the same requirements with no exceptions.

This meeting is documented. (Def.Ex. 141).

(35) After Mr. Cherry's disqualification he was returned to a part-time position with UPS.

(36) On February 10, 1980, Mr. Cherry filed a grievance with the union contesting his disqualification from the sortrac. The grievance states that he failed to reach the required production rate because he was improperly trained. Mr. Cherry contended that he "should be retrained and given a chance to qualify for the job due to the improper training methods of management." The grievance does not mention race as a factor and does not complain that he received improper training from management because of his race. (Def.Ex. 104).

(37) The greivance was settled by an agreement that Mr. Cherry would be offered a chance to qualify for the first full-time job opening and Mr. Ardrey for the second full-time opening in the hub.

(38) Pursuant to the settlement agreement Mr. Cherry was offered a full-time car wash job which he turned down. He subsequently qualified as a package car driver in April 1980.

### 3. *Ardrey and Cherry—Alleged Disparate Treatment*

(1) The parties do not dispute that Mr. Ardrey and Mr. Cherry failed to meet the 200 package per hour requirement and that it was a legitimate requirement. *See, Plaintiff's Proposed Findings of Fact*, p.

82. Mr. Cherry and Mr. Ardrey contend that they could not reach this requirement because they received differential treatment in their training programs because of their race. This alleged differential treatment encompasses less training, less help during slide jams, less encouragement, (i.e., negative work environment), more miskeys and inferior equipment (harder slide assignments and dated charts.)

(2) Mr. Lewis and Mr. Morrow, black employees with UPS, testified to the same effect, that white trainees received more training, better slides, timely help, more reinforcement, less jams and less miskeys than black trainees. Mr. Morrow went as far as to state that "it was suspect" that black trainees were *intentionally* given more miskeys. Mr. Morrow had absolutely no evidence to support his suspicion of intentional wrongdoing, except for his feeling that black trainees received more miskeys than white trainees.

(3) The Court, after carefully considering all the evidence, does not find that Mr. Ardrey, Mr. Cherry, or any other black trainee received differential treatment. The Court is of the opinion that there were glitchs that needed to be ironed out in the training program, such as problems with miskeys and jams on the Sortrac. These problems, however, did not effect just Mr. Ardrey, Mr. Cherry, or the black employees and certainly these problems were not created because of race. They were legitimate run-of-the-mill business problems. Furthermore, as to Mr. Ardrey, these problems would not have any effect on his ability to study his charts and thus develop his chart knowledge. Chart knowledge is a requirement in which success was totally dependent on the time and effort Mr. Ardrey devoted to studying the charts. Mr. Ardrey acknowledged that his lack of chart knowledge was one of the primary reasons for his disqualification.

(4) Mr. Ardrey and Mr. Cherry complained about the belt jamming and about receiving sequence charts too late in the shift. When a jam occurs the entire belt is stopped. All of the employees pitch in

wherever the help is needed to clear the jam because the longer the jamming persists the more difficult it becomes to complete loading of all of the package cars. A jam effects all of the preloaders. As to the changes in the charts, the timing of the adjustment are dependent on various factors. Adjustment in the number of stops for each package car are made from time to time during the sort depending on the package load. If a preloader's stop counts are inaccurate or he is behind in his work, the adjustments would need to be made at the end of the shift.

If the package cars are not loaded and on their way by the end of the shift the pre-sort supervisors must answer to their supervisors about the delay. If the supervisors were to allow jams to build up or to fail to timely load a slide it would directly effect the supervisor's job because he would have to account to his supervisor for his failure to get the package cars loaded and out. Thus, although jams and chart changes did occur during the shifts the Court finds that the supervisors did not condone, tolerate or encourage jam build-ups or inaccurate untimely charts for Mr. Cherry, Mr. Ardrey, or other black employees on the pre-sort. The presence of jams and chart changes are not attributable to racial animus.

(5) Mr. Ardrey and Mr. Cherry contend that their slides, 54 and 25, were harder to work than the other slides. Whether these slides were more difficult, however, is not the issue confronting the Court. Instead, the issue is whether Mr. Ardrey or Mr. Cherry were assigned harder slides because of their race.

The evidence does not support race as a factor in the assignment of slides. Prior to Mr. Cherry, Mr. Hudson trained Tom Styers, a white trainee, on the same slides. Mr. Styers reached a productivity rate of 201 packages per hour (average for his last week) under the same training program and thus was recommended for seniority as a preloader. James Lunn and Sean O'Grady, two other trainees, trained on the other side of the sortrac on slides 23 and 96. Mr. Lunn, black, reached a productivity rate of 160 packages per hour on the twenty-sec-

ond day. He was disqualified for his lack of chart knowledge, but was placed on a preloader job as a result of a union grievance. Mr. O'Grady, white, was not allowed to qualify as a preloader.

David Hemby, a white trainee, qualified as a preloader in the box line. He was trained by Ty Nimmons, a black supervisor.

In light of the above, the Court finds that neither Mr. Ardrey, Mr. Cherry, or any other black trainee was assigned a certain slide because of his race. Both blacks and whites trained on slides 54 and 25, and slides 23 and 96.

(6) The Plaintiffs also assert that they could not qualify as a preloader because they were given inadequate training and received less training and encouragement than the white trainees, especially Mr. O'Grady. After carefully weighing the credibility of the witnesses, the Court finds that neither Mr. Ardrey nor Mr. Cherry were given less training or less encouragement than white trainees. The constant training of both employees is meticulously documented by the evaluation reports. The reports are as positive as they are negative. Further, the reports reflect the fact that considerable time and expense was invested in their training program. UPS had nothing to gain by investing twenty to thirty days in training an employee, only to have him fail to qualify. In addition, if Mr. Hudson harbored some veiled plan to make it hard on Mr. Ardrey or Mr. Cherry to qualify because they were black, Mr. Hudson easily could have been negative in his report in the subjective areas. The fact of the matter is, however, that the only major criticism of Mr. Ardrey concerned his lack of chart knowledge, which lack of chart knowledge was objectively verified by the 80–20 tests. Similar to Mr. Ardrey, Mr. Cherry's major area of criticism was his production rate, which rate along with the amount of help needed was recorded every day based on his actual performance during the shift.

Furthermore, the testimony that Mr. Hudson spent more time encouraging and training Mr. O'Grady than Mr. Ardrey or

Mr. Cherry is beyond belief, because Mr. Hudson was not even Mr. O'Grady's supervisor. Jim Stone trained Mr. O'Grady. After carefully considering the evidence, the Court finds that Mr. Ardrey and Mr. Cherry did not receive differential training as preloaders because of their race.

■ (7) In light of the above, the Court finds that Mr. Ardrey and Mr. Cherry were disqualified from the preloader job on the sortrac because they failed to meet the established performance levels. Even if it is assumed that Mr. Ardrey or Mr. Cherry established a prima facie case of discrimination, the Defendant met its burden of articulating a legitimate reason for the employment actions. Mr. Ardrey and Mr. Cherry failed to meet their ultimate burden of proving that the reason for their disqualification was pretextual or that they received disparate treatment during their training because of race.

## C. CHERRY—DISCRIMINATORY WARNINGS

(1) Mr. Cherry testified that he received two written warnings from UPS, which warnings were racially motivated. In his EEOC charge, Mr. Cherry also complained about a warning issued on May 1981 for failure to follow instructions. Further, in his EEOC charge and trial brief, Mr. Cherry contended that the warnings were issued in retaliation for his opposition to practices illegal under Title VII. The Court will address all the contentions raised.

(2) The first warning that Mr. Cherry complains about was issued because Mr. Cherry missed two pick-ups on a package car run. This warning was issued on February 11, 1981 by Arlin Dancy, the center manager. Mr. Dancy was the manager who qualified Mr. Cherry as a package car driver.

(3) The Plaintiff concedes and the Court finds that the two pick-ups were missed, that the Defendant has a policy which requires a mandatory warning when a package car driver fails to pick up a package and that the warnings were issued to any employee, white or black, who missed a pick-up. The Plaintiff further concedes that this warning was not discriminatory. *See, Plaintiff's Proposed Findings of Fact,* pp. 10–11, 78.

(4) In his EEOC charge, Mr. Cherry complains about a warning issued in "May 1981" for his failure to follow instruction. The warning was actually issued on March 25, 1981 by Mr. Dancy because Mr. Cherry did not notify his supervisor until too late in his run that he could not complete his assigned work. This late notification resulted in thirty-two service failures.

(5) Although the warning letter was referred to in his EEOC charge Mr. Cherry did not elicit any testimony about it from anyone, including himself, or Mr. Dancy. Clearly, the Plaintiff cannot meet his burden of proof if he fails to present any evidence relating to his contention.

(6) The February and March 1981 warning letters were both issued because the incidents involved service failure to customers of UPS.

(7) Under the union contract at the expiration of nine months, the warning is removed from an employee's record and can no longer be used for disciplinary action. The February and March 1981 warning letters issued by Mr. Dancy no longer have any effect on his record and never resulted in any disciplinary action.

(8) The final warning letter complained of by Mr. Cherry was issued on December 18, 1981 by Mr. Dancy because Mr. Cherry failed to "be off the clock" at the designated time. Mr. Cherry contends that the warning is discriminatory because he was off the clock on time or alternatively if he was not off the clock on time, white employees did not receive warnings for the same conduct.

(9) On December 8, 1981 Mr. Cherry punched in at 8:30 and was directed to punch out at 7:30. The punch out time on his card is 1950 (7:50 p.m.). Mr. Cherry testified that he punched out whenever he was suppose to punch out, although he does not know what time that is. Further, he testified that he wrote the clock in time

time of 0830 (8:30) but that he did not write the clock out time of 1950 (7:50 p.m.).

The Court, after examining the time card and the handwriting of Mr. Cherry, is of the opinion that Mr. Cherry did write the "1950" although he no longer recalls writing it. In making this finding the Court notes that the slant, the spacing and the pattern in the numbers are consistent. Further, the zero in the "0830" and "0840" (written by Mr. Cherry) is distinctive and this distinction is also present in the zero in "1950".

Furthermore, after carefully weighing the evidence, the Court is of the opinion that Mr. Cherry did not clock out on time on December 8, 1981. The time card shows that Mr. Cherry did not clock out until 1950. Mr. Cherry cannot even identify the correct time in which he was to clock out. He admits that he did not even ask to see his time card when the supervisor talked to him about being late on the eighth and his only evidence that he punched out on time is his non-specific testimony that he clocked out at whatever time was the correct time.

(10) Mr. Cherry alternatively contends that a white employee, Mark Speiler, was allowed to punch out late without receiving a warning. The personnel file of Mr. Speiler does not contain a warning letter for being off the clock late. The issue before the Court is whether Mr. Speiler actually punched out late.

The only evidence Mr. Cherry offered in support of his contention is his vague testimony that on one occasion, on an unidentified date he observed Mr. Speiler punch out late and he thought the supervisor was in his office when this occurred. Mr. Cherry, however, cannot identify the day this occurred, the time when it occurred, the time when Mr. Speiler was suppose to clock out or whether the supervisor observed or knew that Mr. Speiler was late in getting off the clock. The only documentary evidence presented about Mr. Speiler shows that he punched out at 6:45 on the date that Mr. Cherry punched out at 7:50. There is no documentary evidence, such as a time card, that Mr. Speiler was late at any time. In addition, the evidence shows

that several other whites received warnings for failing to clock out on time. In light of the above, the Court does not credit Mr. Cherry's testimony that the Defendant allowed Mr. Speiler to punch out late without receiving a warning or that Mr. Cherry received his warning because he was black.

(11) The EEOC charge also alleges that these warnings were issued in retaliation for Mr. Cherry's opposition to practices made illegal under Title VII. At the trial Mr. Cherry did not present any evidence to this effect, such as identifying the practices he opposed or his supervisor's knowledge or adverse reaction to these practices. The only grievance Mr. Cherry had filed prior to receiving his first warning concerned his disqualification from the sortrac. This disqualification occurred almost a year before his warning and the grievance complained about his sortrac supervisors, Mr. Young and Mr. Hudson, not Mr. Dancy.

The Court finds that the warning letters were issued for legitimate reasons and not as a pretext for retaliation against Mr. Cherry because he asserted his rights under Title VII.

■ (12) The Court finds that the Defendant issued the warning letter for a legitimate reason—Mr. Cherry's infractions of Company procedure. The Court is further of the opinion that Mr. Cherry failed to prove that the asserted reason was a pretext for discrimination and failed to prove that the warning letters were issued because of his race or in retaliation for opposition to Defendant's alleged discriminatory employment practice. The warning letters were issued for cause in accordance with the Defendant's standard disciplinary practices.

### D. BROWN (Formerly Easterling).

(1) Bessie Easterling Brown was hired by UPS on December 9, 1971 as a package car driver. She held that position until April 15, 1978. In April 1978 she applied for and obtained her current position of feeder driver. As a feeder driver she earns $13.56, one of the higher paying hourly positions at UPS.

(2) She complains of being required to work overtime, of being denied overtime, of not being allowed to decide if she wants to work overtime or not, of being subjected to a biased working environment by being subjected to racially motivated assaults, of being treated rudely by her supervisors, of being placed out of service for one day because she refused to fill out an accident report and of receiving a warning in November 1982 because she had an avoidable accident.

(3) After assessing Ms. Brown's demeanor and testimony at the trial and reviewing her personnel records, the Court finds that Ms. Brown is probably a difficult employee to work with and manage. On the stand she was boisterous, hot tempered, argumentative, and quick to complain. Coupled with this truculent personality is her tendency to blame others instead of accepting some responsibility for acts that occur. For instance, she blames someone else and does not accept responsibility for a one tractor accident she had when she was backing her tractor and hit a guard rail.

(4) A review of her personnel file also indicates that she can be disrespective, uncooperative, and insolent. UPS sent Ms. Brown a letter confirming a meeting with her and her union representatives during which meeting her attitude towards management was reviewed. The letter states that:

> Your past history of speaking above a normal business tone and being disrespectful towards management will not be tolerated in the future. It was reviewed with you the importance of management and employee communication to operate our business in an efficient manner. You were informed that insubordinate employees towards management instruction will be dealt with quickly and severely.

Several months later Ms. Brown received a warning letter for her "demonstrated insubordination by [her] loud and discourteous remarks." There are numerous other documented instances of insolence in her personnel file, such as "she became very arrogant and cutting in her voice", "[a]gain, Bessie became very arrogant and

refused to do so", "carries an arrogant attitude around other employees, they have complained to me about this", "her attitude is such that she causes disruptions in our operation and service", and "Bessie started cussing and swearing". *Defendant's Exhibits 209, 210.* Finally, when Ms. Brown was instructed to fill out an accident report or she would be taken out of service "she then proceeded to write sideways along the accident report not filling it out properly." *Defendant's Exhibit 224–A.* Ms. Brown's own testimony corroborates her impertinent response when instructed to fill out an accident report. After her supervisor told her she would be taken out of service if she did not fill out an accident report, she told him "I said, no, I'm not refusing, and I wrote on the accident report—I wrote on that report." *Transcript,* p. 436.

(5) In light of Ms. Brown's personality and attitude problems at UPS, the Court is of the opinion that the source of many of her complaints can be traced to personality conflicts and not because of her race. The Court, however, will discuss each grievance individually.

(6) In December 1980 Ms. Brown asked her supervisors, Ulysses West and James Elmore, if she could be off work on December 24, 1980. Both supervisors are black. They told her she would have to report on December 24, 1980, at which time the status of her run would be determined. If her run was cancelled she could ask her supervisor on duty if she could leave.

Mr. Elmore prepared a list of employees who requested to be off on December 24, 1980 but failed to include Ms. Brown's name. On December 24, 1980, Ms. Brown's run was cancelled and she asked if she could go home. The supervisor on duty, Neal Lewis, denied her request because her name was not on the list. She was required to work in the yard.

(7) On the same day employees with less seniority than Ms. Brown were allowed to go home. Similarly, white and black employees with more seniority than Ms. Brown worked that day. Scott Heine, a white feeder driver, reported to work after

Ms. Brown and was allowed to go home when his run was cancelled. There was no evidence that white employees with less seniority whose name was not on the list was allowed to go home.

(8) On December 29, 1980 Ms. Brown filed a grievance claiming that her seniority rights were violated because junior employees were permitted to be off and she was not. The grievance does not refer to race, does not suggest that race was a factor in the denial of the day off and does not claim that whites got the day off while blacks had to work. There is no suggestion that her name was intentionally omitted from the list.

(9) This grievance was resolved by an agreement that employees would be let off on the basis of seniority. If a run is cancelled and a senior employee is on the yard, the senior employee will go home and the junior employee will work.

■ (10) The Court finds that the denial of the day off was not because Ms. Brown is black but was because Mr. Elmore, a black male, accidently failed to include her name on the list. The Plaintiff failed to prove that the omission of her name from the list and the resulting denial of the day off was a pretext for racial discrimination.

■ (11) Ms. Brown filed three other union grievances complaining about not receiving or receiving overtime work in accordance with her seniority rights. The grievances do not refer to race or suggest that race was a factor in overlooking her for overtime or assigning her overtime. The union found that her seniority rights were not violated in one instance, that she was entitled to overtime pay in another instance and that UPS needed to assign a start time and specified procedure for extra runs. There is no mention of race in resolution of the grievance or as a condition of settlement of the grievance. The Court finds that the complaints about her seniority rights were problems arising in application of the union contract and Ms. Brown's seniority rights were not being violated because she was black.

(12) Ms. Brown specifically complains about having to take a run to the airport in February 1981 after completing her regular run. The airport run was normally assigned to Kathy Hall, a junior white driver.

(13) On February 2, 1980 Ms. Hall did not arrive back from the airport until 2:10 p.m. and was not able to take her lunch break until 2:30 p.m. Since the first air trailer had to go to the airport before Ms. Hall would have completed her lunch break, Richard Goebel requested that Ms. Brown drive the trailer to the airport and told her that Ms. Hall would bring out the second unit later and help Ms. Brown finish loading the plane. Ms. Brown started cursing and swearing and said that she would not take the run. Mr. Goebel told her he would make other arrangements, and proceeded to get two other drivers to cover the Kannapolis and airport runs. Ms. Brown called Mr. Elmore at his home. Mr. Goebel talked to Mr. Elmore and as a result offered Ms. Brown the option of either taking the Kannapolis or the airport run. Ms. Brown then decided to accept the airport run.

(14) At the airport that evening Ms. Brown's performance was slack and caused the airplane to leave thirty minutes late. Ken Gunnels, air coordinator, wrote Mr. Fisher a memorandum about Ms. Brown's inferior work and asked for assistance. Mr. Gunnels stated that Ms. Brown had difficulty backing her trailer into the appropriate position, was slow unloading the trailer and refused to help Ms. Hall load air bags into her trailer. Her attitude was evidently so "arrogant" that the other employees complained about working with her. Mr. Gunnels concluded that Ms. Brown was not qualified for the airport run and that her attitude causes disruptions in air operations and service.

■ (15) The Court finds Mr. Goebel did not ask Ms. Brown to cover the airport run because of her race. UPS asked her to service the airport run because they needed a driver out there and Ms. Hall was running late. Further, when Ms. Brown refused to take the run, Mr. Goebel proceeded to make other arrangements to cover

the airport run. Ms. Brown was later given the option of taking the run, which option she accepted. Therefore, the Court finds that the Plaintiff failed to prove that the Defendant told her to cover the airport run as a pretext for discrimination.

(16) Ms. Brown testified that in 1981 Larry Shoemaker, a white dispatcher, was extremely rude to her. According to Ms. Brown, when she went to the dispatcher's office to get her tractor assignments, Mr. Shoemaker would toss her the time and TTA cards. If a white driver needed his cards Mr. Shoemaker would hand the items politely to the driver "with a smile". Mr. Shoemaker testified that he treated each driver alike and would hand the cards or place them on the table if he was busy dispatching. He testified that he did not "toss" any cards at Ms. Brown.

■ (17) After carefully judging the credibility of the witnesses, the Court finds that Mr. Shoemaker did not treat Ms. Brown differently than white drivers because of her race. The only evidence that Mr. Shoemaker treated Ms. Brown differently in dispatching was Ms. Brown's own self-serving testimony. This testimony was credibly refuted by Mr. Shoemaker who specifically denied any differential treatment and explained that if a dispatcher was busy he would simply place the cards on the table for the driver. The Court, therefore, finds that the Plaintiff failed to prove that Mr. Shoemaker was "rude" to her or that this alleged rudeness was because of her race.

(18) Ms. Brown testified that Scott Heine, a white co-worker, intentionally assaulted her on two different occasions. At the trial Ms. Brown testified that Mr. Heine intentionally slapped her face and knocked off her glasses in January 1980. She reported this incident to Mr. Elmore, a black feeder supervisor. Mr. Elmore talked to Mr. Heine and told Ms. Brown that Mr. Heine would pay for her broken glasses. Mr. Elmore's report of the incident states that Mr. Heine *accidentally* broke her glasses while jumping off the dock behind the trailer he was pulling. (Mr. Elmore is now deceased.)

(19) Ms. Brown testified that in April 1980 she was standing next to a wall and Mr. Heine pushed his way between her and the wall and tried to shove her. Ms. Brown told Mr. Heine that "you and I just goin' to have it out." He laughed and walked down the hall. She followed him "and said—a few more words was said." Ms. Brown complained about this incident to Mr. Elmore and it did not occur again. Ms. Brown did not testify that Mr. Heine's alleged conduct was motivated by racial animus.

■ (20) In resolving these two employee disputes the Court finds that UPS appropriately handled the matter and did not discriminate against Ms. Brown. Ms. Brown told Mr. Elmore that her glasses were accidentally broken and Mr. Elmore got Mr. Heine to pay for his accident. As to the second incident, it appears to be a dispute triggered in part by sensitivity due to the prior accident and a personality conflict between two employees. The evidence does not support a finding that it was a racial assault. After the incident was brought to the attention of management, the problem was evidently effectively resolved by management because there were not any further disturbances.

(21) Ms. Brown testified that she was issued a warning letter on November 11, 1982 for an accident that was unavoidable. In her accident report she admitted she hit a guard rail while backing her trailer on the yard. She testified that the accident was unavoidable because the trailer had a flat tire and leaned to the right. UPS issued a warning letter because the accident was found to be *avoidable* because she struck a stationary object while backing her trailer.

(22) Although Ms. Brown testified the Company always found accidents avoidable, the Company found an accident that she had on June 25, 1980 was unavoidable.

■ (23) The Court finds that UPS issued a legitimate warning letter to Ms. Brown on November 11, 1982 because they determined her accident was avoidable.

Ms. Brown failed to prove that the warning letter was issued as a pretext for racial discrimination. The Court notes that the Plaintiff evidently concedes that the warning letter was appropriately issued and that the Plaintiff failed to establish a *prima facie* case of discrimination. *Plainiff's Proposed Findings of Fact*, pp. 49, 93.

(24) Ms. Brown alleges she was subjected to racial discrimination because she was placed out of service for one night after she refused to fill out an accident report.

(25) On March 29, 1983 Ms. Brown was instructed to place her trailer at a particular location on the yard. As she backed her trailer toward this location she observed another unit driven by Buck Buchanan, blocking her route. As soon as the midnight hub manager, Donnie Lane, observed the congestion on the yard he instructed Ms. Brown to stay where she was and he went to clear up the congestion blocking her unit. As he was in the process of moving the units, he heard a grinding noise, looked up and saw Ms. Brown's unit moving against Mr. Buchanan's unit. Mr. Lane reported the accident to management.

(26) Ms. Brown got out of her trailer and approached Richard Goebel, Donnie Lane, and Steve Starnes (supervisors) and said "who are you saying hit a truck." They told her she hit the trailer. She denied any accident.

(27) After Mr. Goebel and Ms. Brown were in the feeder office he instructed her to fill out an accident report. It is standard operating procedure at UPS for an employee to complete an accident report after an accident. Ms. Brown denied having an accident and refused to fill out the report.

(28) Mr. Goebel telephoned Silvis Moore at 1:30 a.m. at his residence and asked him what to do about Ms. Brown's refusal to fill out an accident report. Mr. Moore told Mr. Goebel to explain to Ms. Brown, in front of Mr. Lane, that the accident report needed to be completed, to instruct her to complete it and to inform her that if she refused to fill it out she would be suspended.

(29) Mr. Goebel then proceeded to instruct Ms. Brown that she had to fill out the report or she would be suspended. Ms. Brown refused to fill out the report, insisted that she would not take any action unless her business agent was present and instead impudently responded by writing sideways on the report. Mr. Goebel took her out of service for refusing to fill out the report after being instructed to do so.

(30) Ms. Brown was reinstated the next day on the condition that she fill out the accident report, with which condition she complied. She was issued a warning letter for the March 29, 1983 accident because it was avoidable in that while backing her unit she struck another vehicle. Although Ms. Brown continues to deny she had an accident, she does not challenge the issuance of the warning letter.

■ (31) The Court finds that the request that Ms. Brown fill out an accident report is in accordance with the standard operating procedure. The Court further finds that Ms. Brown intentionally refused to fill out the report although instructed to do so and informed of the consequences if she did not comply. This type of conduct is blatant insubordination. The Court finds that the Defendant legitimately and without any regard to race, placed Ms. Brown out of service for her refusal to comply with standard procedures after being forewarned that failure to comply would result in suspension. Waiting for a business agent would not have any bearing on whether a report had to be completed. The Court finds that the Plaintiff failed to prove that the Defendant's actions on March 29, 1983 were in part motivated by race or were a pretext for racial discrimination.

(32) The Court further finds that considering Ms. Brown's complaints separately or in the aggregate she failed to prove that she was treated differently because she was black or that the Defendant's actions were a pretext for racial discrimination.

## E. DISCRIMINATORY ASSIGNMENT OF FEEDER DRIVER EQUIPMENT —FUNDERBURK, NEAL, AND SMITH

(1) Three of the Plaintiffs, Lewis Funderburk, Eugene Neal, and Matthew Smith, testified that they and the other black feeder drivers were discriminatorily assigned feeder driver equipment. They allege specifically that blacks receive older tractors or that if they receive newer tractors they do not operate properly.

(2) UPS uses Mack model 20, 21, 22, 23, 24, and 25 series. The higher the series model number, the newer the unit. The feeder drivers believe that the older tractors have poorer suspension, less pulling power, and are more difficult to handle. UPS believes that all the units are substantially equal because UPS regularly monitors, services, and refits their equipment.

(3) The industrial engineering department assigns the units to a certain run. In assigning tractors to start times the newer equipment or the equipment that gets the better mileage is assigned to the longer runs so that they can be dual utilized. For example in 1983 Charlotte had eighty-five to ninety feeder runs but only sixty-five tractors. Some of the tractors had to be operated on two feeder runs a day. The industrial engineering department determines which tractors would be dual utilized on which start time.

(4) After the tractors are assigned to a run the feeder drivers bid annually in April on the run they want. The bids are accepted on the basis of seniority. The new start times go into effect the first Monday in May. Tractor assignments are not changed on any regular or annual basis.

(5) The industrial engineering department changes the tractor assignments from time to time. Usually new tractors are assigned by industrial engineering so that they can be dual utilized. When the regular assigned tractor to a start time is not available, the dispatcher assigns another tractor to that start time.

(6) Although a unit is assigned to a specified run, various events cause a dispatcher or the industrial engineering department to readjust the assignment of tractors. Tractors break down and are pulled out for preventive maintenance. Repaired outside tractors may be substituted for regularly assigned tractors. State licensing restrictions may require the juggling of tractor assignments. Delays and late arrival of dual utilized tractors cause tractor reassignments. When the feeder operation runs an average of one hour over allowed, the dual utilized tractors return from their first run too late to leave on their scheduled second run. Once a dual utilized tractor gets off schedule, it is almost impossible to get it back on schedule that week. Further, the tractors are also assigned or readjusted on the basis of fuel consumption. The mountain runs need better fuel mileage. There are times when a tractor assigned to a later start time will be used on earlier start time because a spare is not available. Further, when additional loads must be dispatched, a tractor has to be located and assigned to that load.

(7) When a trailer is reassigned the supervisors receive complaints from the white and black feeder drivers. The complaints from the drivers generally concern being assigned a tractor other than their regularly assigned one, because they are familiar with their tractor and until refitted the older tractors did not have air ride seats.

(8) Mr. Funderburk was hired in 1967 and has worked as a feeder driver since 1973. He testified that he and the other blacks were reassigned tractors in the 20, 21, and 22 series while whites were assigned 23 and 24 series tractors.

(9) Mr. Funderburk complained about his equipment assignment to his supervisor and to his manager, Mr. Elmore, who is black. Mr. Elmore explained to Mr. Funderburk that fuel consumption was the basis for assigning tractors.

(10) Mr. Funderburk has had the Pleasantdale, Georgia run since 1978. Mr. Funderburk bid for the Pleasantdale run in April 1982 which run he started in May 1982. When Mr. Funderburk started the run in May, he was assigned a 25 series tractor. After two weeks the 25 series

tractor was reassigned to a White Pine, Tennessee run, manned by Roger Weaver, a white feeder driver. The Tennessee run is a more mountainous run than the Pleasantdale run. The tractor reassigned to the Pleasantdale run was in the 24 series, which series is considered one of the newer series at UPS.

(11) Mr. Funderburk also testified that he was assigned tractors with broken air conditioners. He admitted that he was assigned air conditioned tractors from the time they first came on the line in 1978. He further conceded that most air conditioning problems arise on the first hot day in the spring. The air conditioning would not work because there was not freon in it. They would work when freon was added.

(12) Mr. Moore, the division manager for feeder operations, agreed that air conditioning problems occur with the first warm weather. If the air conditioning is not working, the driver is suppose to write the problem up and it is repaired.

(13) Mr. Funderburk claims that every time he bid on a start time tractor 21913 would be reassigned to that time. He testified, however, that although he drove tractor 21913 in April 1979, when the new bid start times became effective in May 1979 he was assigned air conditioned tractor 25638 and drove it on a regular basis.

(14) The following summary shows the number of tractors in each series driven by Mr. Funderburk:

| SERIES | 20 | 21 | 22 | 23 | 24 | 25 | TRACTORS |
|---|---|---|---|---|---|---|---|
| 1977 | 6 | 21 | 59 | 59 | | | |
| 1978 | 3 | 49 | 28 | 63 | 9 | | |
| 1979 | 2 | 15 | 21 | 34 | 30 | 36 | |
| 1980 | 0 | 7 | 6 | 12 | 35 | 24 | |
| 1981 | 3 | 38 | 9 | 19 | 25 | 13 | |

(15) The summary shows, contrary to Mr. Funderburk's claim, that he was not assigned only to 20, 21, and 22 series tractors. The evidence reveals that he drove the newer 23, 24, and 25 series regularly. After the bids in May 1981, his regularly assigned tractor was tractor 21913. After July 1981, however, he drove a variety of tractors in the 21 to 25 series.

(16) A review of Mr. Funderburk's tractor assignments discloses that he began driving air conditioned tractors in 1978 and has driven them continuously since that time. Air conditioned tractor 24638 was regularly assigned to him from May 1979 until October 1979 when air conditioned tractor 25297 became his regularly assigned tractor. In May 1980 tractor 24812 became and remained his regularly assigned tractor until May 1981.

(17) Mr. Neal was hired by UPS in 1969 and has worked as a feeder driver since 1974. Mr. Neal has been assigned to the White Pine, Tennessee run for the past seven or eight years. This was a night run so he was indifferent as to whether he had an air conditioner in his unit.

(18) Mr. Neal testified that he and the other black feeder drivers had to drive the older series while the white drivers drove the newer 23, 24, and 25 series. He did not complain, however, to management about the quality of his equipment.

(19) The following summary shows the number of tractors in each series driven by Mr. Neal:

| SERIES | 20 | 21 | 22 | 23 | 24 | 25 | TRACTORS |
|---|---|---|---|---|---|---|---|
| 1977 | 12 | 28 | 38 | 55 | | | |
| 1978 | 0 | 13 | 13 | 96 | 10 | 1 | |
| 1979 | 0 | 12 | 4 | 29 | 41 | 1 | |
| 1980 | 0 | 5 | 14 | 25 | 23 | 29 | |
| 1981 | 3 | 6 | 11 | 6 | 2 | 47 | |

(20) The summary shows that, contrary to Mr. Neal's claim, he was assigned the newer tractors as they were placed into the operation. It further appears that he drove the 23, 24, and 25 series tractors on a regular basis.

(21) In his Complaint in this litigation, Mr. Smith also alleges racially discriminatory assignment of equipment to him and the other black feeder drivers. He testified that in 1981 and 1982 black drivers drove the lower series while white drivers drove the higher series. Mr. Smith contended that he never got the consistent use of a newer trailer, that although he was assigned a 23 series he did not often drive it

and that if he was given a 24 series the air conditioning did not work.

(22) Mr. Smith complained about the equipment to Mr. Seagle. He complained to Silvis Moore, James Elmore, and Robert Washington about the air conditioning and was told to write up his complaint. Mr. Elmore and Mr. Washington were black feeder managers.

(23) Mr. Smith was seventeen on the feeder seniority list so he had one of the better choices to bid whichever start time he wanted. Since April 1981 he has bid on the Pleasantdale, Georgia run.

(24) The following summary shows the number of tractors in each series driven by Mr. Smith between August 1977 and December 1982.

| SERIES | 20 | 21 | 22 | 23 | 24 | 25 | TRACTORS |
|--------|----|----|----|----|----|----|----------|
| 1977 | 4 | 27 | 6 | 26 | | | |
| 1978 | 6 | 32 | 13 | 48 | 2 | 1 | |
| 1979 | 2 | 17 | 26 | 26 | 14 | 1 | |
| 1980 | 1 | 5 | 9 | 13 | 48 | 4 | |
| 1981 | 0 | 9 | 1 | 15 | 52 | 4 | |

(25) Contrary to Mr. Smith's testimony the summary shows that he was not assigned only 20, 21, and 22 series tractors. The chart reveals that actually the majority of his tractors were in the 23 and 24 series.

(26) A review of Mr. Smith's assigned tractors shows that he drove tractor 23717 more often than others during August and September 1977. In October 1977 through March 1978 he drove tractor 21507 more often than others. Because of the cooler weather these months would be the months when an air conditioner was of minor or no importance to a driver. In May 1978 through July 1978 he drove tractor 23716 more often than others. In November 1978 he began driving tractor 23595 regularly until May 1979. From May 1979 to September 1979 he drove tractor 22309 the majority of the time. Beginning in October 1979 he drove air conditioned tractor 24638 on a regular basis. In May 1980 air conditioned tractor 24816 became his regularly assigned tractor. From May to October 1981 he drove air conditioned tractor 24638 again. From November 1981 to May 1982 he drove air conditioned tractor 24813.

From May 1982 to October 1982 he drove primarily tractor 22609 but also drove others in all the various series. In October 1982 he began driving tractor 23717 on a regular basis, but also drove many 24 and 25 series air conditioned tractors through December 1982.

(27) The record of the tractors actually driven by Mr. Smith refutes his claim. The record shows that during most of the time from August 1977 to December 1982, he drove series 23 and 24 tractors, not the 20 to 22 series which he testified that blacks drove. The record also shows that Mr. Smith's regular assigned tractors were changed from time to time but were not changed immediately after his bid as he claimed. From October 1979 to May 1982 he regularly drove an air conditioned tractor.

(28) Robert Williams testified to the same effect as Mr. Funderburk, Mr. Neal, and Mr. Smith that black drivers were assigned the older equipment while white drivers were assigned newer equipment.

(29) Ms. Brown, a Plaintiff and a black feeder driver did not complain that she or other black feeder drivers received inferior equipment.

(30) Although the Plaintiffs testified that "whites received better equipment" the only white driver specifically identified as being a beneficiary of this alleged racial policy is Roger Weaver.

(31) The following summary shows the number of tractors in each series driven by Mr. Weaver:

| SERIES | 20 | 21 | 22 | 23 | 24 | 25 | TRACTORS |
|--------|----|----|----|----|----|----|----------|
| 1977 | 0 | 6 | 11 | 21 | 0 | 0 | |
| 1978 | 1 | 9 | 30 | 90 | 2 | 0 | |
| 1979 | 0 | 6 | 7 | 76 | 24 | 9 | |
| 1980 | 0 | 1 | 0 | 48 | 21 | 46 | |
| 1981 | 0 | 0 | 3 | 29 | 10 | 46 | |

(32) The chart shows that Mr. Weaver was also assigned tractors in the older series although he, like the other Plaintiffs, was regularly assigned tractors in the newer series.

(33) Although Mr. Smith and Mr. Funderburk complained to management about

the assignment of equipment, there was not any evidence that they complained that the assignments were made on the basis of race.

■ (34) After carefully considering the evidence, the Court finds that the Company articulated a legitimate explanation for the assignment of tractors to Mr. Smith, Mr. Funderburk, and Mr. Neal. UPS assigned and reassigned tractors to handle the various dispatches and the contingencies which arise in the daily operation of transporting the parcels. The assignment changes that had to be made by the dispatchers at the last minute, which is an on-going activity, would make it even more difficult and troublesome for the supervisors to attempt to discriminate on any basis in the assignment of tractors. The Court finds that the Plaintiffs failed to prove that the assignment of tractors to Mr. Smith, Mr. Neal, and Mr. Funderburk or to black feeder drivers as a group, was done on the basis of race or that the Defendant's legitimate reasons are a pretext for discrimination.

### F. JENKINS

(1) Horace Jenkins was hired by the Defendant on August 30, 1974. On August 4, 1975 he was promoted to package car driver.

(2) In light of the Partial Summary Judgment entered on April 6, 1984, the only claims remaining are discriminatory assignment of equipment, and discriminatory removal of overtime work.

(3) Mr. Jenkins was assigned to the Rock Hill center in 1980. The center was then located in the Charlotte building.

(4) Jim Smith, a black male, was the Rock Hill center manager in 1980. Mr. Jenkins did not like Mr. Smith and the way he ran the center. Mr. Jenkins testified:

"I could write a book on (Smith). I guess everybody could. He has got a nasty attitude."

(5) In 1977, 1978, and 1979 Mr. Jenkins was assigned a P–400 package car. In the early part of 1980 Mr. Jenkins was assigned a P–500 package car. Mr. Smith

believed the package volume warranted a larger van. The P–500 van carries more packages than the P–400 van. The higher the van number, the larger the van size.

(6) Mr. Jenkins' route in 1980 was Lancaster, South Carolina which route included a pick-up volume of about 200 packages per day. The stops included Spring Mills and Clark Controls.

(7) Periodically the industrial engineering department reviews the utilization of package cars in the various centers based on a center's delivery and pick-up volume.

(8) In reviewing the Rock Hill center in the summer of 1980, it was determined that Rock Hill had one more P–600 than its volume justified.

(9) Accordingly, Mr. Smith decided that the P–600 van assigned to Donnie Scronce, a white package car driver, should be relinquished. Mr. Smith reassigned Mr. Jenkins' P–500 van to Mr. Scronce and reassigned a P–400 van to Mr. Jenkins.

(10) The P–600 van was taken from Mr. Scronce because a large pick-up customer in Chester had moved and Mr. Scronce no longer needed the P–600 van.

(11) At the time of the reassignment of the P–400 van to Mr. Jenkins, his route was changed by removing some of his pick-up stops, which change reduced his volume.

(12) Mr. Jenkins did not complain to Mr. Smith about the van reassignment. Mr. Jenkins alleges that the van change to a P–400 constitutes racial discrimination.

(13) In his deposition when questioned as to why this reassignment constituted racial discrimination, Mr. Jenkins replied because Mr. Scronce is white. He further stated that he felt the reassignment was discriminatory because UPS should have come to him first and gotten his consent to give the P–500 van to someone else.

■ (14) Aside from the fact that Mr. Jenkins is black and Mr. Scronce is white, there is not any other evidence suggesting that race played any role in reassigning the van. The center manager who made the changes is black and he had previously

assigned the P-500 van to Mr. Jenkins. Mr. Scronce, White, lost his P-600 van in the reassignment. The reassignments were necessitated after the industrial engineering department determined the volume rate justified the reassignments. In light of the above, the Court finds that the Defendant articulated a legitimate reason for the van changes, which reason the Plaintiff failed to prove was a pretext for discrimination.

(15) It is noted that the Plaintiff apparently concedes he failed to prove his claim of racial discrimination in the assignment of equipment. *See, Plaintiff's Proposed Findings of Fact,* p. 118.

(16) Mr. Jenkins' other claim is that the removal of "one shot" and "call tag" work deprived him of thirty minutes of overtime, which action constitutes racial discrimination.

(17) One shots are onetime customer pick-ups and call tags are requests by the shipper to pick up a package delivered to a customer. These requests are written up in a log so that UPS knows which drivers received the requests and are distributed to the drivers. This work is performed before the 8:30 a.m. start time for the drivers.

(18) Mr. Jenkins was assigned this work after drivers senior to him had declined the work.

(19) UPS made a decision to move the Rock Hill center from Charlotte to Rock Hill, South Carolina. In 1981, prior to the move, the preload of the Rock Hill package cars was placed under Mr. Smith's supervision. This change provided enough additional clerical work to justify a part-time clerk for the Rock Hill center.

(20) After a part-time clerk was employed Mr. Smith removed the one shot and call tag work from Mr. Jenkins and assigned the duties to the clerk. This type of clerical work was removed from all drivers who were performing it and assigned to the clerk. The clerk was white. There is not any evidence that Mr. Jenkins sought the part-time clerk's position.

(21) Mr. Jenkins did not complain to Mr. Smith about the removal of the overtime work.

(22) In his deposition, Mr. Jenkins testified that the removal of overtime would not constitute discrimination if UPS had talked to him about the change and he had agreed that this was the way it needed to be done.

(23) The Court finds that the Defendant articulated a legitimate reason for the removal of one shots and call tags. The removal of the overtime work was applied to all employees. UPS does not have to continue paying an employee overtime when it has hired another employee who can do the work without going into overtime. Mr. Jenkins utterly failed to prove that race played any part in the removal of one shots and call tags.

(24) In addition, the Plaintiff appears to concede that Mr. Jenkins failed to prove pretext. *See, Plaintiff's Proposed Findings of Fact,* p. 118.

## G. MASSEY

(1) Joyce Massey was employed as a part-time operations clerk on April 17, 1978. She was assigned to the simulator job on the midnight sort. This was a nonunion job performed at the Charlotte hub.

(2) Ms. Massey contends she was discharged by UPS because of sex and race discrimination.

(3) Mary Feaster, black, was assigned the simulator job on the twilight sort.

(4) From 1978 to 1979 the Charlotte hub experienced an increasing volume of packages. With the building approaching capacity limits on volume flow, the simulator position became more critical as a key factor in successfully completing the sorts on time. At this point the job of simulator was refined from a clerical responsibility of tracing packages through the hub to one of making management decisions on the movement of packages throughout the hub. In August 1979 UPS decided to eliminate the two part-time clerical jobs of simulator and to replace them with one management

position. This management position was assumed by Ben Taylor, white.

(5) In view of this decision, Tom Husvar, a white district manager and Julius Montague, a black personnel manager, decided that the simulator clerks would be offered an opportunity to qualify as a package car driver or to bump the junior rewrap clerk on their sort.

(6) On August 30, 1979 John Fisher, hub division manager, and Bill Thomas, twilight sort manager, met with Mary Feaster and discussed the operational change and the elimination of her job. They offered her the opportunity to qualify as a full-time package car driver. Ms. Feaster accepted this offer. She became a package car driver and was subsequently promoted to supervisor.

(7) Mr. Fisher and Mr. Thomas also met with Ms. Massey on August 30, 1979 to discuss the change and the elimination of her job. Ms. Massey was offered the same opportunity to qualify for a full-time driving job. She refused the job because she did not want to drive or to work full-time. She was then offered the alternative of displacing the junior clerk on her sort. She responded that she had no intention of handling packages.

(8) Ms. Massey inquired what her option was if she refused driving and the clerk's job. She was told that her position would be phased out by September 7, 1979 at which time she would be laid off. She asked for and received the rest of the night off from work.

(9) On September 6, 1979 Ms. Massey wrote Mr. Fisher confirming their discussion of August 30, 1979 and noting that she was strictly a "pencil and paper person". She requested a temporary lay off. She worked through September 7, 1979 and was placed on temporary lay off.

(10) Ms. Massey knew that refusal of a job after being placed on temporary layoff would result in termination.

(11) After she was placed on temporary layoff a clerical vacancy occurred in the midnight sort. After several attempts Mr. Fisher contacted Ms. Massey on September 25, 1979 and offered her this vacancy, which vacancy involved rewrapping packages. She refused the rewrap clerk position, again stating that she was only interested in "pencil and paper work." Since she declined an available position while on layoff she was terminated. This termination was confirmed in a letter to her dated October 1, 1979. Ms. Massey does not recall receiving this letter although she acknowledges it was correctly addressed.

(12) Ms. Massey claims she was discriminated against because she was not offered a job she wanted. As evidence in support of her claim she relies on the fact that Nancy Calloway, white, became a full-time tracing clerk.

(13) The Court finds that the job placement of Ms. Calloway is not comparable. Ms. Calloway transferred in May 1979 to the tracing clerk position. Her transfer was long before the decision was made to phase out the part-time simulator positions. Ms. Calloway's position was not eliminated, as was Ms. Massey's position. In addition, Ms. Calloway's job as a tracing clerk was full-time and Ms. Massey did not want to work full-time. Thus, this personnel action does not constitute evidence of race or sex discrimination.

(14) There is not any evidence in the record concerning Ms. Massey's allegation of retaliation for filing a Title VII charge against a former employer.

(15) The Court finds that UPS made a legitimate decision to eliminate Ms. Massey's job. She was treated like Ms. Feaster was treated. Ms. Feaster took successful advantage of the job opportunities made available. Ms. Massey seems to claim that UPS was under some obligation to find her a job of her choice after her job was eliminated. There is not any evidence that a white or a male employee was accommodated with a job of his choice. UPS was nondiscriminatory in the elimination of her position and in the offer of jobs.

(16) Ms. Massey received job offers which she refused. She knew the refusal of a job after temporary lay off would

result in termination. There is not any evidence that racially premised factors entered into any aspect of the elimination of her job, the offers of alternative jobs or her termination. Ms. Massey failed to prove her claims of race or sex discrimination.

(17) The Court notes that the Plaintiff evidently concedes that she failed to prove her claims of discrimination. *See, Plaintiff's Proposed Findings of Fact*, pp. 106–07.

## H. NEAL

(1) Eugene Neal was hired on November 17, 1969 as a full-time package car driver. He qualified as a feeder driver on September 14, 1973.

(2) Mr. Neal claims that feeder equipment was discriminatorily assigned. This claim has already been adjudicated by the Court in Section E, *supra.* His remaining claims concern denial of a supervisory position and racial harassment by his supervisor Neal Lewis.

(3) On September 2, 1980 Mr. Neal wrote a letter of grievance to the district manager complaining that he and the other black employees were being racially harassed by Mr. Lewis. This grievance was precipitated by Mr. Lewis' alleged failure to honor seniority in August 1980.

(4) One day in August 1980 after Mr. Neal returned from his run he observed some white drivers leaving the hub. The white drivers had less seniority than Mr. Neal.

(5) When Mr. Neal and Robert Chisholm, another black driver, saw Mr. Lewis he instructed them to go to the rail yard to pick up trailers. This is overtime work which work is supposed to be offered to the most senior employee in the yard, who can refuse it. Mr. Neal told Mr. Lewis that he did not want the work. Mr. Lewis and Mr. Neal talked about the situation. Mr. Lewis told Mr. Neal that at that particular time he needed Mr. Neal to take the work and that Mr. Neal should not even question him about it because they did not have men available at that particular time.

(6) Mr. Neal stated in his grievance that Mr. Lewis constantly harassed him because of his race. As an example, Mr. Neal referred to Mr. Lewis telling him not to park his tractor in front of the door leading into the dispatch office. Mr. Neal felt this was a trivial matter to correct him on and therefore an example of Mr. Neal's "picking" on him. UPS has posted a notice in the feeder office requesting the feeder drivers not to park their tractor outside of the dispatch office but instead to park it against the fence.

(7) Mr. Neal also complained to his manager, Mr. Elmore, about Mr. Lewis.

(8) After UPS received the grievance they initiated an investigation. Mr. Hanley, the district manager, directed Ron Johnston the district personnel manager to investigate the claim of racial harassment. The basis for Mr. Neal's grievance was his perception that his supervisor, Mr. Lewis, was picking on him because he was black.

In the course of the investigation Mr. Johnston interviewed the division manager, Bill Richards, Mr. Lewis, and Mr. Neal. In addition he talked to the shop steward, Bobby Bolin. Mr. Bolin is black. Mr. Bolin told Mr. Johnston that he did not believe that Mr. Neal's treatment was racially motivated or warranted involving other employees. As a result of the investigation Mr. Johnston concluded that Mr. Neal was not being harassed because of his race.

(9) Mr. Johnston reported his conclusions back to Mr. Richards and Mr. Hanley.

(10) Mr. Lewis left UPS in 1982.

(11) Although Mr. Neal testified that Mr. Lewis discriminated against him, Mr. Neal did not assert that the investigation of Mr. Johnston was anything less than it should have been or was tainted because of racial animus.

■ (12) The Court finds that UPS did not subject Mr. Neal to racial harassment through one of his supervisors. Although Mr. Neal may have perceived Mr. Lewis' instructions as racist, the Court is of the opinion that Mr. Lewis was simply trying to handle the responsibilities on his shift. Further, the Company conducted a thorough investigation of Mr. Neal's claim and

the black shop steward informed UPS that he did not think that Mr. Neal was being singled out or harassed because of his race. The Court, therefore, finds that Mr. Neal failed to prove he was racially harassed by Mr. Lewis or treated differently than white employees because of his race.

(13) Mr. Neal also alleges that UPS discriminated against him in failing to promote him to a supervisory position.

(14) Mr. Neal testified that he never expressed an interest to anyone at UPS about becoming a supervisor.

(15) Mr. Neal testified that he did not approach anyone about becoming a supervisor because between 1980 and 1982 he had observed employees being approached by management and being asked if they were interested in supervision. Mr. Neal was never asked if he was interested in supervision.

(16) In order to be considered for a supervisory position, an hourly employee has to submit a letter of intent. UPS also approaches hourly employees to see if they are interested in supervisory positions.

(17) Mr. Neal testified that he was qualified to perform the duties of feeder supervisor and thus he should have been approached because of his training and experience as a feeder driver.

(18) Mr. Neal had eight years of experience in driving feeder trucks. He was number fifty on the feeder driver seniority list. There were seventeen blacks and thirty-two whites senior to him on the seniority list. These forty-nine drivers had more training and feeder driver experience than Mr. Neal.

(19) Mr. Neal acknowledged that seniority is not a criteria for selecting supervisors and that both blacks and whites with more seniority than Mr. Neal had been selected for supervision.

(20) As evidence of discrimination, Mr. Neal relies on the fact that Roger McQuage, Scott Heine, and Dennis Marks, all white, were promoted to feeder supervisor positions even though they had no feeder driver experience or less feeder driver experience than Mr. Neal. Mr. McQuage

and Mr. Marks were package car drivers and did not have any prior feeder driver experience. Mr. Heine had two and one half years of feeder driver experience at UPS when he was promoted.

(21) James Elmore and Robert Washington, both black, became feeder managers although neither of them had any experience as feeder drivers.

(22) From January 1, 1979 to November 17, 1982, UPS promoted three black and ten white employees to first line supervisory positions.

(23) After Mr. Johnston came to the Western Carolina district he began in late 1980 and 1981 to seek out employees who might be interested in supervision. In the course of his activities he spoke to Silvis Moore, division manager, and Mr. Elmore, manager, about candidates within the feeder group. Mr. Elmore named some employees who might be interested in supervision and whom he could recommend.

(24) In meeting with the managers, Mr. Neal's name came up and Mr. Elmore stated he could not recommend Mr. Neal for a supervisory position because of an incident in Raleigh when Mr. Neal pulled a knife on his supervisor.

(25) The black and white feeder drivers that Mr. Moore and Mr. Elmore recommended for consideration as supervisors included John Todd, white, Bob Lee, black, and Henry Grier, black.

(26) Bob Lee, a black employee, received the highest recommendation. Mr. Johnston interviewed Mr. Lee. Mr. Lee stated he did not want to go into supervision.

(27) The other possible candidates were interviewed by Mr. Moore and Mr. Elmore who reported they were not interested in supervision.

(28) On April 15, 1976 Mr. Neal threatened a supervisor with a knife and was suspended. Again, on February 15, 1977 he was suspended for assaulting an employee.

(29) The Court finds that the evidence does not support Mr. Neal's claim of

discriminatory denial of a supervisory position. First, he never inquired into a position or at least inquired into how to apply for a position. Second, the thrust of Mr. Neal's contention is that experience or seniority as a feeder driver entitles that driver to be promoted to supervision. Under Mr. Neal's theory, there would be thirty-two other white, and seventeen other black, feeder drivers more qualified than Mr. Neal to be offered a supervisory job or approached about supervision. Third, in UPS' informal survey of its management personnel for potential supervisory candidates, Mr. Neal was not recommended for consideration because of past conduct for which he was disciplined. Both black and white managers participated in that decision. Other black feeder drivers were recommended for consideration as supervisors, but they advised management they were not interested. The promotions to supervision from January 1, 1979 to November 17, 1982 shows three blacks and ten whites were promoted. The Court, therefore, finds that UPS not only articulated but proved that it had two legitimate reasons for not promoting Mr. Neal to supervision. Mr. Neal failed to establish pretext in those reasons.

## I. SMITH

(1) Matthew Smith was hired as a full-time car washer on April 3, 1967. He qualified as a feeder driver in 1970. He was removed as a feeder driver on July 28, 1972 because of an accident involving a fatality. He returned to a feeder driver job on August 6, 1973.

(2) Mr. Smith complains that racial discrimination exists in the assignment of feeder driver equipment and in the issuance of warnings and suspensions he received in April 1981 for his refusal to follow instructions. The claim concerning assignment of equipment is resolved by the Court in Section E, *supra.* Thus, the only claim remaining concerns the April 1981 warnings and suspensions.

(3) Jim Seagle, white, was a feeder supervisor in charge of twelve to fifteen drivers in "B" center in 1981. These drivers had start times from 5 or 6 a.m. to 8 or 9 a.m.

(4) Mr. Seagle's job was to train new drivers, retrain old drivers, and to ride with each driver at least once a quarter. Mr. Seagle-supervised Mr. Smith from 1979 to 1982.

(5) Mr. Smith bid for and received the Bracey/Charlotte run. Richard Shaw, Vilas Brown, Jim Morgan, white, also ran that same route. Their start times were close together.

(6) In early 1981 Mr. Seagle was informed that the over allowed time on the feeder runs he supervised was excessive. Over allowed time results in UPS having to pay overtime to the employees. Mr. Seagle was instructed to reduce the over allowed time and to start working with the driver who had the most over allowed time.

(7) Each tractor has a tacograph which charts the driver's actual course driven on a particular day, including the stops he takes.

(8) UPS allots nine hours, fifteen minutes to nine hours, thirty minutes for the entire Bracey/Charlotte run. This allotment includes break time. There is a total of one hour for all breaks. The breaks can be taken in sequences of fifteen, thirty, fifteen, or fifteen, forty five. The longest break is to be taken at Bracey, Virginia, the turnaround point. Only one break is to be taken before arriving at Bracey. UPS regiments the break time because from five to seven minutes are lost every time a tractor stops, due to the loss of momentum when making the stop and the time it takes to build momentum after the stop.

(9) Mr. Seagle started working with Mr. Smith to reduce his over allowed time. He discovered from the operation report that Mr. Smith was losing time on his start work, finish work, on the road and taking excessive breaks.

(10) The pre-trip procedure should take twenty minutes. Mr. Smith was exceeding this twenty minute allotment. Mr. Seagle retrained Mr. Smith on the proper pre-trip procedures.

(11) In reviewing Mr. Smith's taco-graphs, Mr. Seagle realized that Mr. Smith was taking more than one break on the Charlotte to Bracey leg of his run.

(12) Mr. Seagle started riding with Mr. Smith on his run. He found Mr. Smith was not maintaining fifty five miles per hour and was taking unauthorized stops.

(13) Before leaving on a run with Mr. Smith on April 8, 1981 Mr. Seagle instructed Mr. Smith that only one stop was authorized on the Charlotte to Bracey leg of the run.

(14) Mr. Smith ignored Mr. Seagle's instruction and stopped twice on the way to Bracey. When Mr. Seagle told Mr. Smith that the second stop was unauthorized Mr. Smith replied he was stopping anyway and he planned to keep stopping.

(15) Mr. Seagle reported the incident to the feeder manager, Roger Heen. On April 10, 1981 Mr. Heen issued Mr. Smith a warning letter for his failure to follow his supervisor's instructions concerning taking an unauthorized break.

(16) On April 13, 1981 Mr. Seagle again rode with Mr. Smith and instructed him that only one stop was authorized on the way to Bracey.

(17) They left the Charlotte gate at 7:25 a.m. and Mr. Smith took a break one hour later at 8:30 a.m. at Peeler Road. He then took a second break at the Virginia state line at 11:34 a.m. He arrived at Bracey seven minutes later at 11:41. Mr. Smith drove the Raleigh to Charlotte leg of the trip without having to stop. That segment is longer than the segment from Peeler Road to Bracey. When told this by Mr. Seagle, Mr. Smith jumped out of the tractor and went to the restroom.

(18) Mr. Seagle reported to Mr. Heen that again, contrary to Mr. Seagle's instructions, Mr. Smith made an unauthorized stop, which stop was only four miles from Bracey.

(19) On April 16, 1981 Mr. Heen issued a one day suspension letter to Mr. Smith, because of his failure to follow his supervisor's instructions on April 8, and 13, 1981.

(20) Mr. Smith filed a union grievance protesting the warning letter and his suspension. Mr. Smith did not suggest that race was a factor in his treatment. The substance of Mr. Smith's complaint was that he did not believe UPS had the right to tell an employee when he could go to the restroom and if an employee felt he needed to use the restroom the break should not be considered unauthorized. His grievance provides:

> "if I need to use the restroom, I will use it. If we can't come to grips on something, that seems to be trivial to you, yet vital to me, some action must be taken. I'll take any action necessary in order to keep the right to use the restroom when I need to."

This grievance was denied.

(21) On April 16, 1981 Mr. Seagle rode with Mr. Smith again. Before they left on the run Mr. Smith told Mr. Seagle that if he planned on instructing him not to take any unauthorized breaks he may as well fire him now because "if I've got to stop, I'm going to stop." Mr. Seagle told Mr. Smith his instructions had not changed and only one stop was authorized.

(22) During the run, Mr. Smith took his break in Lexington, North Carolina. Mr. Smith stopped again at the 209 mile marker, located approximately twenty-five miles from Bracey.

(23) Mr. Seagle reported the incident to his manager, Mr. Heen. On April 20, 1981 Mr. Heen issued a two-day suspension letter for Mr. Smith's failure to follow his supervisor's instructions on April 8, 13, and 16, 1981.

(24) On April 21, 1981 Mr. Seagle was prepared to ride with Mr. Smith again. After Mr. Smith coupled and pre-tripped his unit he was ready to depart the gate at 7:15. As Mr. Smith was about to leave the gate on time he pulled his unit over and said he had to clean the windows. Mr. Seagle told Mr. Smith his windows were fine and to proceed out of the gate on time. Mr. Smith replied that he was going to clean his windows. Again, Mr. Seagle told Mr. Smith the windows were fine and to

depart on his run. Mr. Smith said he was not going until he cleaned the windows and "I don't care what you say." Mr. Smith stopped in front of the feeder office and got out of the tractor to clean the windows. Mr. Seagle put him out of service at that time.

(25) On April 24, 1981 the division manager issued a termination letter to Mr. Smith due to his failure to follow his supervisor's instructions.

(26) In the grievance hearing under the union contract at the panel Mr. Smith was reinstated with the loss of back pay.

(27) Mr. Seagle was able to reduce Mr. Smith's over allowed time in some areas such as on the road time, turn around time and start time. This reduced the amount of Mr. Smith's overtime pay.

(28) During the time that Mr. Seagle rode with Mr. Smith, Mr. Smith pointed out that other drivers would pass him, which he contended meant that they were also taking unauthorized breaks. These drivers were Vilas Brown and Richard Shaw, and Jim Morgan, white feeder drivers. Mr. Seagle told Mr. Smith he was not to be concerned about what the other drivers did or did not do and that Mr. Seagle would get up with those drivers.

(29) Mr. Seagle talked to all of his feeder drivers, including Mr. Brown, Mr. Shaw, and Mr. Morgan about their performance and about taking unauthorized breaks. After Mr. Seagle talked to them, they stopped taking unauthorized breaks. Thus, since they complied with their supervisor's instructions after being told not to take unauthorized breaks, they did not receive warning letters.

(30) Mr. Seagle also rode with the other drivers to try and reduce the amount of over allowed time. Other drivers reduced their over allowed time after being counseled. Mr. Seagle was able to reduce the over allowed time of his drivers from one hour to twelve minutes per driver per day.

(31) After Mr. Smith was reinstated Mr. Seagle rode with him on his new bid run to Pleasantdale, Georgia. Mr. Smith performed all the aspects of the job within the allowed times and took only one break to Pleasantdale, a four hour, thirty-three minute trip.

(32) Mr. Smith testified he did not have any physical problem which required him to use the restroom excessively.

(33) The Court finds that Mr. Smith strenuously objected to the one break policy. As a result he did not attempt to comply with the policy or cooperate in the reduction of his over allowed time. His unauthorized stop, four miles from Bracey, suggests intentional defiance of his supervisor's instructions. The fact that a black employee has to comply with an employment procedure he does not like is not race discrimination. Racial discrimination is present if there is one policy for whites and one policy for blacks or the policy is not uniformly applied. That is not the situation in this case. The other employees, even though they too may not have liked the policy, complied with it after their supervisor instructed them not to take unauthorized breaks. Mr. Smith, however, continuously refused to comply with his supervisor's instructions and therefore he received the warning letters and his suspensions. An employer should not have to instruct an employee on at least three different occasions to comply with a procedure the employer has determined to be beneficial. Further, an employer should not have to tolerate an employee that repeatedly refuses to adhere to instructions. The Court finds that the warnings, suspensions, and termination of Mr. Smith were given to him because of his willful conduct in disregarding his supervisor's instructions. The discipline was justified and race definitely was not a factor in imposing the discipline. Assuming the Plaintiff established a *prima facie* case of discrimination, the Defendant established legitimate reasons for their actions which reasons the Plaintiff failed to prove were pretextual.

**J. WATTS**

(1) Carl Watts was hired on February 9, 1976 as a part-time loader. He alleges racial discrimination in the denial of a pack-

age car position and in the issuance of warnings due to his failure to comply with his supervisor's instructions.

(2) In June 1981 Mr. Watts was a part-time unloader assigned to the midnight sort which sort lasted three and one half hours to four hours. Van Smith was Mr. Watt's immediate supervisor. Mr. Smith reported to Harry Wolfe, the midnight sort manager.

(3) In order to coordinate the flow of unloading packages, UPS adopted a policy of requiring employees to notify their supervisor before leaving the work area. Thus, if an unloader left the work area his sorter, who would be without work, could be switched temporarily to another position if necessary or a supervisor could temporarily unload the van.

(4) Mr. Smith informed all of his employees they were to notify him whenever they left the work area for any reason. Notification could be by word of mouth, by a hand motion, by eye contact or in some other informal manner.

(5) When the new policy was first explained, Mr. Watts told Mr. Smith that he was not going to notify Mr. Smith when he left. Mr. Smith reported this comment to Mr. Wolfe, his manager.

(6) After the new policy was announced, employees who failed to notify their supervisor when they left the work area, were reminded of the rule and instructed to follow it. After this oral counseling most employees adhered to the policy.

(7) On June 2, 1981 Mr. Watts failed to notify his supervisor when leaving the work area. Mr. Smith and Mr. Wolfe orally instructed Mr. Watts to comply with the rule. A warning letter was not issued.

(8) Mr. Watts told Mr. Wolfe and Mr. Smith that he would not abide by the rule.

(9) Mr. Watts violated the rule again on June 24, 1981. Thus, on June 30, 1981 he was sent a warning letter for failing to follow his supervisor's instructions on June 2 and June 24, 1981.

(10) Mr. Wolfe talked with Mr. Watts after issuing Mr. Watts the June 30, 1981 warning letter. Mr. Watts replied he did not agree with the rule, he thought it was childish, he did not plan to follow the rule and if he needed to leave he would leave.

(11) Mr. Watts again violated the rule on June 26, 1981 and received a one day suspension because of his failure to follow his supervisor's instructions.

(12) After his one day suspension Mr. Watts reiterated to Mr. Wolfe that he still did not plan to adhere to the policy.

(13) After receiving a one day suspension, Mr. Watts again violated the rule for which he had just been suspended. On July 2, 1981 he received a three day suspension letter for his failure to follow his supervisor's instructions on four different occasions concerning leaving the work area.

(14) On June 25 and June 29, 1981 Mr. Watts filed two union grievances protesting the warning notices and the one day suspension. In the grievances Mr. Watts stated that he told his supervisor that he would not abide by this rule and that "I do not allow myself to be governed by his stupid rules." The second grievance also asserts that the rule was not applied to white employees. Both grievances were denied.

(15) In grievance meetings held to try and resolve the grievances, both shop stewards, Johnny Wilson and Henry Tyson (a Plaintiff in this litigation) attempted to persuade Mr. Watts to follow the rule.

(16) Mr. Watts contends that the rule was enforced against him but was not enforced against white employees. The white employees he contended were not subject to the rule were Jimmy Duncan, Curtis Sutton, Charles Elrod, and Sherwood Page.

(17) After Mr. Wolfe talked to Mr. Duncan about following the rule he had no further problems with him. Mr. Elrod and Mr. Sutton were not under Mr. Smith's supervision.

(18) The other employees did complain about the rule. After Mr. Wolfe talked to the employees he did not have any trouble with anyone following the rule, except Mr. Watts. The only white employee who

pushed the rule was John Dulin. Mr. Dulin was written up for not following the rule. Mr. Dulin finally decided to abide by the rule after Mr. Wolfe and John Fish talked to him.

(19) Other white employees were talked to about following the policy. Frank Lawson was talked to about the rule and a written notation placed in his personnel file. The same happened to Randy Lankford. Both of these employees observed the rule after counseling.

(20) In addition, Mr. Wolfe talked to Sherwood Page and Curtis.Sutton, white, about observing the rule. All did so after they were counseled.

(21) Mr. Watts was the only employee who was given formal warning letters and suspensions for violating the rule. Mr. Watts, however, was the only employee who stated he would not follow the rule even after counseling and who could not be persuaded to follow the rule until he received a *second* suspension and was advised by his co-workers to comply.

(22) The Court finds that the Defendant articulated a legitimate reason for issuance of the warning and suspensions. Mr. Watts knew of the policy and deliberately chose repeatedly to violate it, even after being counseled and warned to comply. In light of Mr. Watts' failure to respond to counseling, if UPS could not issue a warning letter they would be saddled with an employee who would not work under the same conditions and rules as the other employees. When Mr. Watts refused to comply and stated his intention never to comply, after being counseled otherwise, UPS had absolutely no other viable alternative except to issue a warning letter and hope that the letter would bring Mr. Watts in line. The letter having failed, the next step was a brief suspension and that having failed, the next step was a longer suspension with the hopes of avoiding an eventual discharge.

Further, the policy was applied uniformly to all employees. Although the other employees disliked the rule they realized, after being talked to by UPS, that they had to adhere to the policy or risk disciplinary

action. Although several employees initially challenged or ignored the rule, these employees were all talked to and not one white employee continued to violate the policy after being warned to comply. The fact that Mr. Watts is black does not protect him from having to adhere to a rule he dislikes which rule is applied consistently to all employees. The Court finds that the warnings were issued for just cause and that the Plaintiff failed to prove pretext.

(23) On May 25, 1983 Mr. Watts filed another charge of discrimination alleging he was disqualified as a package car driver because of his race and because he was a Plaintiff in this litigation.

(24) The Defendant moved that the subject matter of the package car charge be included in this litigation. The Defendant's motion was allowed and the Plaintiff was allowed to amend the Complaint.

(25) Mr. Watts applied for a full-time package car driver position and in March 1983 began his training to qualify for the position. Dale Hollifield, white, was his trainer and immediate supervisor.

(26) Mr. Watts was placed in the standard training program for package car drivers. The trainee's progress is charted by the supervisor. The trainee is shown the progress chart and initials it. Deliveries are made prior to lunch and pick-ups are made after lunch. The progress chart shows how much time the trainee exceeds the required time. Mr. Watts does not challenge the adequacy of his training as did Mr. Cherry and Mr. Ardrey concerning the sortrac.

(27) After two days of orientation Mr. Watts received on the road training by Mr. Hollifield for four consecutive days. Mr. Watts then went out by himself.

(28) His progress was reviewed every day. He was instructed to call in if he fell behind in making deliveries.

(29) Mr. Watts was talked to about an open bulkhead door on March 30, 1983, about returning to the center with missed packages on April 14, 1983, about recording packages at the time the deliveries

were attempted or made on April 15, 1983, and again about leaving the bulkhead door open on April 18, 1983.

(30) On April 18 and 19, 1983, as a result of a call in by Mr. Watts at 4:40, four of his pick-up stops were reassigned to another driver.

(31) On April 21, 1983 a customer called in complaining that Mr. Watts had missed his pick-up the last two days. Mr. Watts denied missing the pick-ups.

(32) Mr. Watts' progress was charted every day. His actual progress failed to equal or exceed expected performance. Thus, he was not meeting the standard. He took more time than was allowed to do the job every day except one.

(33) From the seventeenth to the twenty-first day of training, Mr. Watts needed to perform the job at "scratch" in order to qualify as a package car driver. He had to run his route with an average of no over allowed time.

(34) Mr. Watts ran over allowed .70 on the seventeenth day, .47 on the eighteenth day, 1.04 on the nineteenth day, −.82 (under allowed) on the twentieth day and .30 on the twenty-first day. The twentieth day was the first time Mr. Watts ran under allowed.

(35) Unless Mr. Watts ran substantially under allowed on the twenty-first day he would not have qualified as a package car driver. He ran over allowed on the twenty-first day.

(36) On April 27, 1983, Hershel Fitzgerald, division manager in charge of package car operation, observed Mr. Watts unloading an inordinate number of packages from his car. Mr. Fitzgerald instructed Ray Hancock, the center manager for the area where Mr. Watts worked, to audit Mr. Watts' car and delivery records the next day.

(37) On April 28, 1983 supervisor Steve Ogelsby audited Mr. Watts' package car after Mr. Watts returned to the Charlotte building. Mr. Ogelsby found twenty-nine undelivered packages on Mr. Watts' car. Six of the twenty-nine packages had been recorded by Mr. Watts. After auditing the packages and records Mr. Ogelsby determined that twenty-five of the packages were "missed packages".[2] A missed package is a package in which no delivery attempt has been made.

(38) The packages were taken to the office. Mr. Ogelsby corrected Mr. Watts' time card to show that he had twenty-five missed packages. Mr. Ogelsby also made changes in Mr. Watts' card to show 231 gross packages were delivered in area 1002 and 236 in area 1001. He reported his findings to Mr. Hancock and Mr. Fitzgerald.

(39) On April 28, 1983 Mr. Hollifield met with Mr. Watts in the morning. He asked Mr. Watts to call in at 1:30 p.m. Mr. Watts called in at 3:00 p.m. and reported that all of his deliveries were completed except four misloads. He was instructed to deliver the misloads when he made a pick-up on an adjacent street.

(40) When Mr. Watts returned to the building that evening Mr. Hollifield reviewed his time card with him. His card reflected 113 delivery stops which number seemed high to Mr. Hollifield. Mr. Hollifield went through the delivery records and found eighty-eight stops. Mr. Watts' time card was changed accordingly. Instead of sixty stops in area 1001, Mr. Watts had thirty-five. If the number of stops had remained at sixty he would have come in under allowed.

(41) On April 29, 1983 Mr. Fitzgerald reviewed the missed packages and made a list showing that twenty-three packages had not been delivered. He gave Mr. Watts the benefit of doubt on two packages listed on his delivery sheets as undelivered. Mr. Fitzgerald charged Mr. Watts with only twenty-three undelivered packages because Mr. Watts had six undelivered packages noted on his records.

---

**2.** There were some packages recorded as an attempted delivery which Mr. Ogelsby considered missed packages, because the delivery was to a radio station and a driver can get in a television or radio station almost any time of the day.

(42) Mr. Fitzgerald called Mr. Watts in his office and confronted him with what the audit disclosed. Mr. Watts said he made all his deliveries. Mr. Fitzgerald disqualified Mr. Watts for failing to deliver twenty-three packages and for failing to report the delivery failure.

(43) UPS calls failing to report delivery failures, "burying packages." The penalty for burying packages is disqualification. Under UPS' operating procedures, if undiscovered by the audit the twenty three undelivered packages left on the van would have been treated as pick-up packages and run through the system again. The packages would have ended up in Mr. Watts' van for delivery the following day. None of the records maintained by UPS would show this repetition had occurred.

(44) Mr. Watts has a right under the union contract to reapply for a package car position one year after his disqualification.

(45) Between January 1, 1983 and July 30, 1983 three whites, two blacks, and one American Indian qualified as package car drivers. During this same period seven whites and six blacks failed to qualify. Thus out of a total of ten whites, three qualified. Out of a total of eight blacks, two qualified. Out of a total of one American Indian, one qualified.

(46) The Court finds that Mr. Watts was not discriminated against on account of his race or on account of filing previous charges with the EEOC. Mr. Watts was disqualified as a package car driver because he buried packages. Although Mr. Watts denies having buried any packages the Court resolves the credibility issue in favor of Mr. Fitzgerald. First, Mr. Watts' denial is consistent with his denial of the customer's complaint that he failed to make his pick-ups. Second, UPS followed its standard procedures in training and auditing Mr. Watts' performance. It seems unlikely that twenty-one days would be spent in training an employee in order to conspire with the auditor and the supervisor to fabricate a story of buried packages. Further, Mr. Watts' progress chart indicates that he would not have reached the required performance level at the end of his twenty-first day of training. The Court, therefore, finds that the Defendant articulated a legitimate reason for disqualifying Mr. Watts and the Plaintiff failed to prove that the reason was pretextual or had a causal relation to his EEOC charges.

## K. PETTIGREW

(1) Cheryl Pettigrew filed a charge of racial discrimination on May 9, 1980. She filed a motion to intervene in this action and was allowed to intervene by Order of the Court on October 28, 1982.

(2) Ms. Pettigrew was hired by UPS on August 8, 1977 as a part-time customer service clerk in the customer service department of the general office. She was hired by Jack Denton, white, who became her immediate supervisor. She was employed by UPS until May 8, 1980. She has not held a bargaining unit position.

(3) On August 23, 1978 she applied for a full-time billing clerk position. She was not interviewed or selected for the position. A more senior black employee, Rose Marie Lipscomb, whose previous job performance had been very good, was selected for the vacancy.

(4) On November 30, 1978 Ms. Pettigrew applied for a full-time tracing clerk position in the delivery information and claims (D.I.C.) department. She was recommended for this position by Mr. Denton, her supervisor.

(5) Columbus Feaster, black, interviewed the candidates, including Ms. Pettigrew, for the vacancy. He selected Diane Deal, a white part-time customer service clerk, for the position.

(6) Ms. Pettigrew applied for a full-time claims adjuster position in the D.I.C. department on April 25, 1979. Her supervisor, Curt Brown, would not recommend her for the position because her job performance was average or below average and thus did not warrant a recommendation. Mr. Brown advised Ms. Pettigrew that if her job performance improved he would be pleased to recommend her for the position.

(7) Recommendation by an employee's immediate supervisor is a prerequisite for a transfer or a promotion to a new position.

(8) The vacancies in the D.I.C. at that time were filled by Joyce Cunningham, black, and Nancy Calloway, white.

(9) On June 19, 1979 Ms. Pettigrew asked to be considered for another full-time tracing position in the D.I.C. department. Ms. Pettigrew's work had improved to the point where Mr. Brown decided he could and should recommend her for the position. She was selected for the position.

(10) Ms. Pettigrew started training as a full-time tracing clerk on July 2, 1978. Her immediate supervisor and trainer was Mr. Denton, the supervisor who initially hired her at UPS and who first recommended her for a position.

(11) As a tracing clerk, Ms. Pettigrew was assigned to do the tracers for the Myrtle Beach, Anderson, and Orangeburg, South Carolina centers.

(12) The duties of a tracing clerk consist of tracing delivery of packages in the assigned areas, filing damage reports, and filing and auditing various delivery records.

(13) The tracing job involves following a detailed step-by-step procedure to determine if a package has been delivered to the consignee. The tracers are placed in order from the oldest to the most recent. The clerk must determine the shipping date, the approximate delivery date, the place of delivery, and check the delivery records to see if delivered and signed. If the package had been delivered the receiving signature would be traced and sent to the shipper as proof of delivery. If a signature is not discovered then the delivery records for five days are checked, seven days, then sixteen days. If the sixteen day search fails, the damage reports and then the loss log and the irregular reports are examined. The consignee or the center would then be called to see if they are holding the package. If all these steps are unsuccessful, the tracer is classified as a claim.

(14) The tracers for which delivery cannot be proven are called loss damage investigation (L.D.I.) and are given to a retrace clerk who follows the same procedure as the tracing clerk to see if proof of delivery was missed by the tracing clerk. If the retrace clerk cannot find proof of delivery then the tracer is sent for claims processing.

(15) Ms. Pettigrew's training was conducted by Mr. Denton who reviewed her progress with her each week. Her initial training period was for four weeks. She did not meet the performance goals during the four week training period. The performance goals were to close fifty-five tracers per day, have no more than 10% L.D.I. and to close twelve tracers per hour. Her tracer hourly averages for the first four weeks were 4.8, 4.6, 5.7, and 6.6. Her performance the fourth week of training was forty-one tracers per day and 29% L.D.I.'s. Her reports suggested that she needed to work a tracer until it was complete, to enter tracers on the time card and to organize her work area.

(16) Although Ms. Pettigrew did not achieve her performance goals, UPS extended her training until August 20, 1979 because she had shown progress each week.

(17) On September 11, 1979 Ms. Pettigrew was warned for holding her L.D.I.'s until the end of the day. She had held ten L.D.I.'s on September 6, seven L.D.I.'s on September 7, and five L.D.I.'s on September 10, 1979. When a tracing clerk holds the L.D.I.'s until the end of the day, then the retrace clerk does not have time to check the L.D.I.'s that day.

(18) On September 25, 1979 Mr. Denton performed a full day on-the-job evaluation of Ms. Pettigrew's performance in accordance with the standard procedure. As a result of the evaluation, Mr. Denton prepared a list of twelve areas in which Ms. Pettigrew needed to improve her job performance.

(19) Mr. Denton followed her progress in improving these twelve areas. In a review on October 5, 1979 he found that she had corrected six areas and four areas still needed to be corrected. This report was

reviewed with Ms. Pettigrew on October 8, 1979.

(20) A second follow up was conducted by Mr. Denton on October 9, 1979 to reemphasize the importance of doing her job effectively. Ms. Pettigrew had still failed to correct the four areas. Mr. Denton advised Ms. Pettigrew that her job performance and attitude needed to improve or disciplinary action to and including discharge would be taken.

(21) On November 5, 1979 Mr. Denton talked with Ms. Pettigrew about holding back tracers. A tracer was found in her desk with an answer from the center. The tracer had been there for two days. This was the second time Mr. Denton talked to Ms. Pettigrew about holding back tracers.

(22) On or about February 12, 1980 Ms. Pettigrew asked for and was given a different tracer area. She felt that if she had a larger area she would be able to close more tracers. She was given the Spartanburg and Asheville centers which had more tracers than her previous area. This area had been assigned to Nancy Calloway. Ms. Pettigrew's area was then assigned to Ms. Calloway.

(23) Ms. Calloway did not have any problem satisfying performance standards in either area.

(24) On February 13, 1980 Mr. Denton talked to Ms. Pettigrew about failing to turn in tracers and about keeping her delivery records in proper order. He advised her that if these problems continued, disciplinary action would be taken. Ms. Pettigrew refused to sign the documentation of this discussion because she felt Mr. Denton "was picking" on her.

(25) On February 20, 1980, Mr. Denton performed another full day on-the-job evaluation of Ms. Pettigrew's performance. Mr. Denton found that she was not following the proper procedures, was handling records roughly, had too many L.D.I.'s and needed to increase her production to twelve tracers per hour.

(26) In addition Mr. Denton discovered that Ms. Pettigrew was continuing to hold back tracers. On February 20, 1980 Ms.

Pettigrew turned in eight L.D.I.'s after 4:45 p.m., five of which claims were found by retracing on February 21, 1980. On February 19, 1980 Ms. Pettigrew turned in seven claims after 4:45 p.m., five of which claims were found the next morning by retracing. Mr. Denton told Ms. Pettigrew she was either holding the claims to the end of the day causing them to be late to the center or she was closing them as L.D.I.'s without checking them properly. She was advised that this was not acceptable job performance.

(27) On February 25, 1980 Ms. Pettigrew turned in eight L.D.I.'s after 4:45 p.m. Five were found by retracing on the next day.

(28) On February 26, 1980 seven L.D.I.'s and five N.T.A.'s were turned in after 4:45 p.m. Ms. Pettigrew had two of the L.D.I.'s and three of the N.T.A.'s since the first dispatch.

(29) On February 27, 1980 Ed Bruce, division manager of delivery information and loss prevention and Fred Pennington, Mr. Denton's manager, met with Ms. Pettigrew to review her job performance. Although Ms. Pettigrew stated she knew how to do her job, Mr. Bruce found upon questioning her that she was not completely familiar with the procedures to follow in tracing. Mr. Bruce told Ms. Pettigrew that UPS would retrain her. Once, however, the training was received the accountability would be hers to perform her job. She was advised that if she continued to fail to do her job after the retraining, she would be terminated. Mr. Denton was called into the meeting to be made aware of Ms. Pettigrew's feeling that he was picking on her. Mr. Denton committed to retraining Ms. Pettigrew.

(30) The retraining of Ms. Pettigrew began on March 5, 1980 and was carried out on a planned schedule. On March 17, 1980 Mr. Denton reviewed Ms. Pettigrew's performance and explained to her that she was not meeting performance goals. Mr. Denton again reviewed what performance standard was expected of her. Ms. Pettigrew stated she did not need any further train-

ing. Mr. Denton prepared an "individual progress review" and noted she needed improvement in all areas. Ms. Pettigrew refused to sign the appraisal form and felt she was doing a good job.

(31) On March 26, 1980 Mr. Denton talked to Ms. Pettigrew about her progress after her retraining. He told her that he believed that she knew how to do the job but that she was not actually doing the job. Her attitude seems to be "I don't care". Ms. Pettigrew responded that she was doing her best but was unable to reach her goals. She stated that you could not have a good day, every day. Mr. Denton explained to her that he did not expect everyone to reach their goals every day but that this month she had only reached her goals two times and had only reached her goals ten times all year.

(32) On April 1, 1980 Mr. Bruce, Mr. Pennington and Mr. Denton talked to Ms. Pettigrew about her retraining period. Ms. Pettigrew acknowledged she had received the retraining she requested yet she was not meeting her performance goals. Her explanation was that she was doing the best she could and she could not have a good day every day. Mr. Bruce advised Ms. Pettigrew she would have one week to improve and if she did not show she could perform the job, disciplinary action would be taken. She was told a review would be held April 8, 1980.

(33) On April 8, 1980 Ms. Pettigrew asked Mr. Pennington why other employees had received a pay increase and she had not. She stated that UPS was trying to humiliate her and she was being treated unfairly. Mr. Pennington replied that they had been more than fair to her and had given her more attention, assistance, and training than any other employee. She threatened to go to the district manager and get an attorney. Mr. Pennington reminded her of the previous counseling concerning her job performance. Mr. Pennington further informed her that her performance on April 4, 1980 did not indicate that she was concerned about her job. She replied that she had a bad day. Mr. Pennington told her she needed to have more good days and less bad days.

(34) On April 9, 1980 Ms. Pettigrew requested and was granted time off because of a death in the family. She told Mr. Pennington she would call April 10 and advise him of her status and try to return to work on April 11, 1980. She was not heard from until she returned to work on April 16, 1980.

(35) On April 18, 1980 Ms. Pettigrew was advised that she would not receive a salary increase because of unsatisfactory work performance. She was told a future wage review would be held on May 8, 1980. Ms. Pettigrew refused to sign the wage review form.

(36) In addition, on April 18, 1980 Mr. Bruce, Mr. Pennington, and Mr. Denton discussed Ms. Pettigrew's performance and status with her. She was told that still she was not achieving her performance goals. Due to the recent death in the family, however, they were going to give her an additional two weeks to prove that she could perform her job. During these two weeks, the supervisors would not have discussions or meetings with her. Her performance goals for the two weeks were reviewed. She was advised that she would have to reach the goals eighty percent of the time. The goals were twelve tracers per hour, no more than ten percent L.D.I.'s and no more than two percent overlooks. She was told the time limit would not be extended if she was absent. If she failed to reach the goals she would be terminated. If she reached the goals her wages would be reviewed.

(37) Out of the ten days Ms. Pettigrew met her overlook goal every day but only met her tracer per hour goal on six days and her L.D.I.'s goal on three days. Ms. Pettigrew failed to meet her goals eighty percent of the time.

(38) The decision was made to terminate Ms. Pettigrew on May 8, 1980 for failure to perform her job in the prescribed manner. The decision was made by Mr. Bruce, Mr. Pennington, and Julius Montague, a black personnel manager.

(39) Ms. Pettigrew was called in on May 8, 1980 and told she would be terminated,

but she was first offered the opportunity to resign. She refused to resign and was terminated. After she was terminated her working area was found to be in disarray.

(40) Karen Dunn, a white tracer began her training under Mr. Denton on June 26, 1979. She was trained in the same manner as Ms. Pettigrew for the tracing clerk position. She went through the same four weeks training period as Ms. Pettigrew and additional training. She did not meet her performance goals during the training.

(41) On November 5, 1979 Mr. Denton talked to Ms. Dunn about a tracer found in her trash can and her overlook and error problems.

(42) On December 3, 1979 Mr. Denton again talked to Ms. Dunn about her error problem and advised her that if she continued to make errors disciplinary action would be taken.

(43) On January 28, 1980 because of Ms. Dunn's failure to improve she was told by Mr. Denton that if she had two bad answers during the month of February she would be discharged.

(44) On January 24, 1980 she was cited for failing to fill out her time card.

(45) On March 18, 1980 Mr. Denton prepared an "individual progress review" of Ms. Dunn. She was continuing to have problems with errors, overlooks, and tracers per hour.

(46) On April 15, 1980 Ms. Dunn was advised that she would not receive a salary increase because of her performance. A future wage review was scheduled for May 15, 1980.

(47) Mr. Denton reviewed Ms. Dunn's poor performance with her on April 21, 1980. She was informed that she would have one month to improve to an acceptable level. If she reaches her goals during this period she will be given a wage increase. If she fails to reach the goals, disciplinary action, up to and including discharge, would be taken. Her goals were to close twelve tracers per hour, only five overlooks per month, and only five errors a week. She was not told that she only had

to meet her goals eighty percent of the time.

(48) On May 23, 1980 Mr. Denton and Mr. Bruce met with Ms. Dunn and told her she was going to be discharged for failing to improve her performance. She was given the option of resigning which option she accepted. She resigned on that date.

(49) Nancy Calloway, white, and Joyce Cunningham, black, who filled tracing vacancies before Ms. Pettigrew entered the department and met the performance standards.

(50) Ms. Pettigrew and Ms. Dunn were the only employees in the department who were terminated.

(51) Ms. Pettigrew argues that Ms. Dunn who had similar problems to Ms. Pettigrew was treated differently. Ms. Pettigrew contends that since Ms. Dunn was given one month to improve her performance, was not given an L.D.I. goal and did not have to meet her goals eighty percent of the time she was given preferential treatment prior to her discharge. Ms. Pettigrew contends this "preferential treatment" is, or is evidence of, racial discrimination.

The Court finds Ms. Pettigrew's contentions to be completely without merit. Ms. Dunn was not given preferential treatment. Both employees were disciplined and constructively criticized in accordance with their particular deficiencies. Ms. Dunn was not given an L.D.I. goal but then Ms. Pettigrew was not given a five error per week limit. Further, the instructions to Ms. Dunn were that she was to satisfy her goals during this probationary period and not that she only had to attain her goals eighty percent of the time. Similarly, although Ms. Pettigrew was given a two week probationary period and Ms. Dunn a one month probationary period, Ms. Pettigrew had been given a *previous* probationary period, which this period was an extension of, because of a death in her family. In addition, Ms. Pettigrew was not told that if she had two errors in one month she would be discharged and Ms. Dunn was not afforded a one month retraining program.

The Plaintiff wants the Court to look at a single frame of an entire picture to find discrimination. Under the Plaintiff's approach Ms. Dunn should allege racial discrimination because she was not afforded a one month retraining program, she was not given an extension of her probation period, she was subjected to a two error goal and she was not told she only had to meet her goals eighty percent of the time, while a black employee received those advantages. The fact is that in looking at the entire picture the evidence reveals that if anyone received preferential treatment, it was Ms. Pettigrew. Each employee was warned and disciplined according to their own performance problems. Both Ms. Pettigrew and Ms. Dunn trained and worked as tracing clerks during the same period of time, both failed to improve their performance after numerous discussions and warnings and both were separated from UPS in May 1980.

(52) The Court finds that Ms. Pettigrew was discharged because of her poor performance and that she was not treated differently than Ms. Dunn because of her race. Further, the Plaintiff failed to prove pretext in the treatment of her by UPS as a tracing clerk or in her subsequent discharge.

## L. RACIST ATMOSPHERE—MORROW AND TYSON

(1) Jerome Morrow was hired August 25, 1970 as a part-time employee. He became a full-time preloader/sorter on June 7, 1976 and a full-time car wash/shifter on August 25, 1981.

(2) In the Complaint filed in this litigation, Mr. Morrow claims he was required to work in a "racist atmosphere" and was denied a promotion to a supervisory position. Mr. Morrow's supervisory claim was abandoned and no evidence was offered in respect to it.

(3) Mr. Tyson was hired August 18, 1970 as a part-time employee. He became a full-time preloader/sorter on April 22, 1974 and returned to part-time work on June 18, 1974. On March 8, 1982 he became a full-time car wash/shifter. He worked in the "blue label" area from the latter half of 1978 until he obtained the car wash/shifter position. Air packages are processed in the blue label area.

(4) In the Complaint, Mr. Tyson claims he was subjected to working in a racist atmosphere.

(5) The other Plaintiffs also incorporated a general racist atmosphere claim in addition to their individual claims.

(6) The Complaint specifies the racist atmosphere as:

(a) Blacks have a more difficult time in moving from part-time laboring positions to part-time supervisory or full-time laboring positions;

(b) Blacks are treated differently than whites when attempting to qualify for full-time positions;

(c) Blacks are more likely to be suspended, terminated, or disciplined than white employees; and

(d) Blacks receive the more difficult work assignments.

(7) The testimony elicited from Mr. Morrow and Mr. Tyson with respect to the racial atmosphere claim was more limited than the broad general allegations in the Complaint. Both Mr. Morrow and Mr. Tyson testified about the discontinuance of the "affirmative action committee." Mr. Tyson testified that in the blue label area blacks were given harder work assignments and that Mr. Tyson received more criticism. Mr. Morrow testified that in the pre-sort area, blacks were not trained the same as white employees. Mr. Tyson and Mr. Morrow did not testify about any other specific instances or examples of racist atmosphere.

(8) The treatment of blacks and whites as preloaders in the pre-sort area has already been discussed and resolved by the Court in Section B, in which section the Court found that the evidence showed that black preloaders did not receive differential treatment in their training, treatment, and working conditions.

(9) Mr. Tyson testified that after John Franz, white, became the supervisor in the

blue label area blacks were expected to do more work than whites.

As an example of the harder work Mr. Tyson testified that Nadine Roberts, black, transferred from airbagger to loader, Sammie Tillman, black, transferred from airbagger to loader and Mack Jackson, white, transferred from bagging air packages to bagging small packages. Mr. Tyson testified that the job transfers, in his opinion, were harder jobs for blacks and easier jobs for whites. Mr. Tyson, however, did not have any further information about what precipitated the transfers, such as whether the transfers were requested. Further, Mr. Tyson did not testify that Mr. Tillman or Ms. Roberts ever told him that they did not want a transfer or were dissatisfied with a transfer. The people who were transferred did not testify at the trial. There was not any evidence that UPS received any type of complaint from the employees who were transferred. Further, Mr. Tyson retained his job as a bagger which position he testified was easier than loading packages. Mr. Tyson also testified that Mr. Franz was always telling him to work harder. Mr. Tyson, however, acknowledges the number of employees performing his job was decreased from five to two employees.

██ The Court finds that Mr. Tyson's evidence is insufficient to establish a claim of working a racist atmosphere in the blue label area. Simply observing that two black employees are transferred for reasons totally unknown to Mr. Tyson is not being forced to work in a racist atmosphere. Contributing to the lack of unpersuasiveness of the evidence is the fact that Mr. Tyson retained his position which work he contends is easier than loading parcels and that Mr. Tyson has absolutely no evidence regarding the circumstances surrounding the transfer.

(10) Mr. Morrow and Mr. Tyson specifically complain about the discontinuance of the affirmative action committee and that this action either constitutes racial discrimination against them or is evidence of having to work in a racist atmosphere. In the *Plaintiff's Proposed Findings of Fact,*

however, the Plaintiff concludes that the discontinuance of the affirmative action meetings was a management decision well within the discretion of UPS and that UPS discontinued the meetings because, from management's perspective, the meetings were no longer productive. Thus, the ending of the meetings is neither an indicator of bias nor non-bias. *Plaintiff's Proposed Findings of Fact,* p. 113.

(11) The Court finds that the evidence presented at the trial, supports the Plaintiff's proposed conclusion that the discontinuance of the meeting was a legitimate business decision which decision did not suggest racial bias.

(12) When Tom Husvar was district manager, Mr. Morrow was a shop steward and the majority of complaints he received as shop steward were resolved at affirmative action meetings.

(13) The primary purpose of the meetings was to handle complaints, grievances, and safety matters. "It wasn't set up for the racial things" but for all problems.

(14) Mr. Tyson was a member of the affirmative action committee during its existence. Mr. Tyson testified that the largest number of grievances he handled as shop steward were racial complaints. Yet he acknowledged that when Mr. Husvar was the district manager "we didn't have racial problems".

(15) The minutes of the affirmative action committee which met every Thursday night were kept by Mr. Morrow and show at most three references to racial problems for the period from September 14, 1978 to March 6, 1980. John Fisher, who attended most of the meetings, did not know of any incident of racial discrimination arising at the meetings.

(16) Mr. Tyson testified that management stopped attending the meetings in the early part of 1979. In fact, however, some management attended as late as November 1979.

(17) Before Mr. Hanley became district manager, management had decided that the meetings were non-productive and had

turned into grumble and grievance type sessions.

(18) Mr. Hanley, who was the district manager from 1980 to 1983, learned about the affirmative action committee when he first came to Charlotte. It was not meeting on a frequent basis and many management personnel refused to attend the meetings. Mr. Hanley decided the meetings were unproductive and there was no further need for the committee.

(19) Mr. Hanley advised Mr. Morrow and Mr. Tyson that there were not going to be any further affirmative action meetings and they were to use the collective bargaining grievance procedure to resolve complaints.

(20) Mr. Tyson told Mr. Hanley that "there would be trouble, we would meet downtown with the lawyers."

(21) The Court finds that discontinuance of the affirmative action committee was a legitimate business decision by UPS and was taken for the purpose of channelling grievances through the union grievance procedure. The Court further finds that discontinuance of these unsuccessful meetings did not constitute creation of a racist atmosphere.

(22) With respect to the remaining broad general allegations in the Complant concerning racist atmosphere, which matters were not specifically testified about beyond what has already been discussed, the Court reincorporates and refers the Plaintiffs to the Court's findings of fact on their individual claims of discrimination, which claims were all found not to be the result of racial discrimination. The Court further notes that in reaching the findings all the evidence has been examined with respect to each claim to decide if there was a general atmosphere of discrimination.

(23) The Court further notes as signficant that four of the Plaintiffs, Ms. Brown, Mr. Funderburk, Mr. Neal, and Mr. Smith, were hired into full-time jobs. Six of the Plaintiffs, Mr. Ardrey, Mr. Cherry, Mr. Jenkins, Mr. Morrow, Mr. Tyson, and Ms. Pettigrew, were hired as part-time employees and at different times transferred to full-time positions. Although Mr. Ardrey and Mr. Cherry did not qualify for full-time sortrac, they qualified for other full-time positions.

(24) The twelve Plaintiffs in this litigation referred at the trial to at least nine black supervisory personnel under whom they worked. The black management personnel identified includes Charles Johnson, Ty Nimmons, James Elmore, Ulysses West, Robert Washington, Jim Smith, Julius Montague, Mary Feastor, and Columbus Feaster.

(25) Ms. Brown, Mr. Funderburk, Mr. Neal, and Mr. Smith are employed as feeder drivers, the highest paid hourly classification at UPS. This is a full-time job and these four Plaintiffs qualified for the job on their first attempt.

(26) Five of the Plaintiffs, Mr. Cherry, Ms. Brown, Mr. Funderburk, Mr. Jenkins, and Mr. Neal, are or have been package car drivers and qualified on their first attempt, except for Mr. Cherry.

(27) From January 1, 1978 to December 31, 1979, nine black and sixteen white part-time bargaining unit employees qualified as full-time package car drivers.

(28) From January 1, 1980 to December 31, 1981 five black and eight white part-time bargaining unit employees qualified as full-time package car drivers.

(29) With respect to the allegation concerning disciplinary action, the ten Plaintiffs covered by the union contract received warning notices or suspensions under the union contract during the three year period immediately preceding the filing of this litigation as follows:

| | | |
|---|---|---|
| ARDREY | 12/21/81 | warning letter |
| | 2/10/82 | suspension |
| CHERRY | 2/11/81 | warning letter * |
| | 3/25/81 | warning letter * |
| | 12/18/81 | warning letter |
| | 5/19/82 | warning letter |
| BROWN | 7/3/80 | warning letter |
| | 12/18/81 | warning letter |
| | 11/16/82 | warning letter * |
| | 4/1/83 | warning letter * |
| FUNDERBURK | 12/12/80 | suspension |

JENKINS 12/24/81 warning letter
1/5/82 verbal warning
1/7/82 warning letter
1/11/82 warning letter
2/8/82 suspension

MORROW 2/18/82 warning letter

NEAL None

SMITH 8/8/80 warning letter
10/20/80 warning letter
12/16/80 warning letter
4/10/81 warning letter *
4/16/81 suspension *
4/20/81 suspension *
4/24/81 termination converted to suspension *
12/23/81 warning letter

TYSON 4/7/82 warning letter

WATTS 9/26/79 warning letter
10/10/79 suspension
10/1/80 warning letter
6/24/81 warning letter *
6/26/81 suspension *
6/30/81 suspension *

(30) Eleven of the warning/suspension letters (* above) are claimed to have been issued for racially discriminatory reasons. Of these eleven, seven involve the deliberate refusal of Mr. Smith and Mr. Watts to follow specific supervisory instructions. There are no claims of racial discrimination on twenty one of the warning/suspension letters.

(31) The statistics for the Plaintiffs' job classification reveal the following:

**BLACKS AND WHITES BY JOB CLASS FOR 12/31/79**

| JOB CLASS | BLACK | % | WHITE | TOTAL |
|---|---|---|---|---|
| Package Driver | 41 | 29 | 101 | 142 |
| Loader/Unloader (PT) | 130 | 29 | 326 | 456 |
| Preloader/Sorter (FT) | 6 | 25 | 18 | 24 |
| Carwash/Shifters | 2 | 50 | 2 | 4 |
| Feeder Driver | 25 | 30 | 59 | 84 |
| Clerk (PT) | 6 | 33 | 12 | 18 |
| Tracing Clerk (FT) | 4 | 25 | 12 | 16 |
| | 214 | 29 | 530 | 744 |

**BLACKS AND WHITES BY JOB CLASS FOR 12/31/80**

| JOB CLASS | BLACK | % | WHITE | TOTAL |
|---|---|---|---|---|
| Package Driver | 42 | 28 | 108 | 150 |
| Loader/Unloader (PT) | 137 | 36 | 248 | 385 |
| Preloader/Sorter (FT) | 6 | 27 | 16 | 22 |
| Carwash/Shifters | 2 | 33 | 4 | 6 |
| Feeder Driver | 26 | 33 | 53 | 79 |
| Clerk (PT) | 9 | 47 | 10 | 19 |
| Tracing Clerk (FT) | 3 | 21 | 11 | 14 |
| | 225 | 33 | 450 | 675 |

**BLACKS AND WHITES BY JOB CLASS FOR 12/31/81**

| JOB CLASS | BLACK | % | WHITE | TOTAL |
|---|---|---|---|---|
| Package Driver | 45 | 31 | 100 | 145 |
| Loader/Unloader (PT) | 162 | 38 | 266 | 428 |
| Carwash/Shifters (FT) | 9 | 36 | 16 | 25 |
| Feeder Driver | 26 | 28 | 76 | 92 |
| Clerk (PT) | 9 | 45 | 11 | 20 |
| Tracing Clerk (FT) | 3 | 21 | 11 | 14 |
| | 254 | 35 | 480 | 724 |

**BLACKS AND WHITES BY JOB CLASS FOR 12/31/82**

| JOB CLASS | BLACK | % | WHITE | TOTAL |
|---|---|---|---|---|
| Package Driver | 39 | 31 | 87 | 126 |
| Loader/Unloader (PT) | 161 | 36 | 289 | 450 |
| Carwash/Shifters (FT) | 12 | 43 | 16 | 28 |
| Feeder Driver | 27 | 27 | 72 | 99 |
| Clerk (PT) | 7 | 41 | 10 | 17 |
| Tracing Clerk (FT) | 3 | 21 | 11 | 14 |
| | 249 | 34 | 485 | 734 |

(32) The Court finds that after considering all the evidence the Plaintiffs were not subjected to work in a racist atmosphere. The only atmosphere at UPS was one of methodical organization, with numerous operating procedures, which procedures were implemented down through the hierarchy, in order for UPS to ensure that they remain highly competitive in the parcel industry by providing efficient expedient customer service throughout the United States.

## CONCLUSIONS OF LAW

(1) This action was instituted by the Plaintiffs under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*, and 42 U.S.C. § 1981.

(2) The Court has jurisdiction over this litigation pursuant to 28 U.S.C. § 1343. Defendant UPS is an employer as that term is defined by 42 U.S.C. § 2000(e)(b) of Title VII and the Court has jurisdiction over the parties to this action.

(3) Both Title VII and Section 1981 prohibit discrimination in employment because of an employee's race. Title VII further prohibits discrimination in employment because of an employee's sex. The well-known order and allocation of proof set forth in the seminal cases of *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) are applicable to the Plaintiffs' claims under Title VII. *Burdine*, the more recent case, summarized the three stages in the proof of such claims: the claimant must prove by a preponderance of the evidence a *prima facie* case of discrimination; if the claimant proves a *prima facie* case, the employer has the burden to articulate a legitimate nondiscriminatory reason for the employment decision in order to rebut the inference of discrimination raised by the plaintiff's *prima facie* claims; once the employer articulates the reason, the claimant then has the burden to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were but a pretext for discrimination. *Burdine, supra,* at 253, 101 S.Ct. at 1093. At all times the plaintiff retains the ultimate burden of persuading the court that he has been the victim of intentional discrimination. *Burdine, supra,* at 256, 101 S.Ct. at 1095.

■ (4) In Title VII cases, such as the instant action, in which disparate treatment is the basis of the Plaintiffs' claims, the Plaintiffs must prove intentional discrimination. The trier of fact may rely on inferences rather than direct evidence of intentional discrimination, but discriminatory intent must be proved by a preponderance of the evidence, whether direct, circumstantial or otherwise. *Texas Department of Community Affairs v. Burdine, supra; Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

■ (5) To establish a *prima facie* case of discrimination the plaintiff must prove:

actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were "based on discriminatory criterion illegal under the Act."

*Furnco Construction Corp. v. Waters*, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *see also; Texas Department of Community Affairs v. Burdine, supra; McDonnell-Douglas Corp. v. Green, supra.*

■ (6) The plaintiff may establish a *prima facie* case of discrimination by proving the elements of the traditional *McDonnell-Douglas* formula: (1) that he is a protected employee; (2) that he applied for and was qualified for an open position; (3) that, despite his qualifications, he was rejected; and (4) that after his rejection the employer continued to seek applicants with claimant's qualifications. *McDonnell-Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Although *McDonnell-Douglas* involved a refusal to hire because of race, courts have consistently modified the requirements to fit discharge, promotion, wrongful transfer and other employment discrimination claims, whether arising because of race or sex.

■ (7) A plaintiff may establish a *prima facie* case of discriminatory discharge under the *McDonnell-Douglas* model by showing that: (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) despite his qualifications he was discharged; and (4) after his discharge the employer continued to seek applicants from persons of complainant's qualifications. *Smith v. University of North Carolina*, 632 F.2d 316 (4th Cir. 1980). Alternatively, a plaintiff may establish a *prima facie* case by showing that he was discharged and that a non-protected status person whose conduct was similar to his was retained. *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Anderson v. Savage Laboratories, Inc.*, 675 F.2d 1221, 1225 (11th Cir.1982); *Aquamina v. Eastern Airlines, Inc.*, 644 F.2d 506, 508 (5th Cir.1981).

■ (8) In a failure to promote claim a plaintiff may establish a *prima facie* case under the *McDonnell-Douglas* framework by proving that: (1) he belongs to a protected class; (2) that he was qualified for and applied for a promotion; (3) that he was denied a promotion; and (4) that other employees of similar qualifications who were not members of the protect-

ed class received the promotion. *Bundy v. Jackson*, 641 F.2d 934 (D.C.Cir.1981). If, however, an employer fails to utilize a formal system of posting openings, an employee is not required to ask for a position. *See, e.g., Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 35 EPD ¶ 34.587 (11th Cir.1984); *Gifford v. Atchinson, Topeka and Santa Fe Railway*, 685 F.2d 1149 (9th Cir.1982). If promotions are employer initiated, the failure to apply will not bar an action. *See, e.g., Reed v. Lockheed Aircraft Corp.*, 613 F.2d 757, 761 (9th Cir. 1981).

■ (9) A plaintiff in a wrongful transfer action, may establish a *prima facie* case of discrimination pursuant to the *McDonnell-Douglas* analysis by showing that: (1) he was a member of a protected class; (2) he was qualified for the position for which he sought transfer; (3) he was not selected for transfer; and (4) the employer filled the requested position with a non-class member. *Bostic v. Wall*, 588 F.Supp. 994, 1002 (W.D.N.C.1984), *aff'd*, 762 F.2d 997 (4th Cir.1985).

■ (10) In a claim involving discriminatory disciplinary action the plaintiff may show either that he did not violate the employment rule or that if he did, other employees not within the protected class who engaged in comparable acts were not similarly treated. *See, e.g., McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973); *McDonald v. Santa Fe Transportation Co.*, 427 U.S. 273, 281–83, 96 S.Ct. 2574, 2579–80, 49 L.Ed.2d 493 (1976); *Anderson v. Savage Laboratories, Inc.*, 675 F.2d 1221, 1224 (11th Cir.1982). Similarly, a plaintiff may establish a case of discriminatory terms and conditions of employment by showing differential treatment, which treatment favored a non-protected employee. *Long v. Ford Motor Company*, 496 F.2d 500, 505 (6th Cir.1974).

■ (11) If the plaintiff succeeds in proving a *prima facie* case of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged action. *Texas Department of Community Affairs v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. This burden is merely a burden of production of evidence and the burden of persuasion does not shift to the defendant. *Id.* at 256–57, 101 S.Ct. at 1095. If the defendant carries this burden of production, the plaintiff must then prove by a preponderance of the evidence that the proffered reasons were not the true reasons for the employer's decision, but rather were a pretext for discrimination. *Id.* The burden of showing that the reasons articulated by the defendant are pretextual merges with the plaintiff's ultimate burden of persuading the court that he was the victim of racial or sexual discrimination. *Id.*

■ (12) The Court recognizes that if the employee's diminished work performance is caused by the employer's discrimination, then the employer cannot rely on diminished work performance as a nondiscriminatory reason for disciplinary action. *See, e.g., DeGrace v. Rumsfeld*, 614 F.2d 796, 803–04 (1st Cir.1980). The Court further recognizes that Title VII protects the individual and thus a "bottom line" defense is not cognizable. *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982).

■ (13) The Plaintiff may establish pretext by "persuading the Court that a discriminatory reason more likely motivated the employer or indirectly by showing the employer's proffered reason is unworthy of credence." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). In determining whether the plaintiff can meet his ultimate burden of proving pretext and discrimination, the Court analyzes the evidence on a cumulative basis. *See, e.g., Brown v. Eckerd Drugs*, 663 F.2d 1268, 1270 n. 3 (4th Cir. 1981), *vacated and remanded on other grounds*, 457 U.S. 1128, 102 S.Ct. 2952, 73 L.Ed.2d 1345 (1982); *Roman v. ESB*, 550 F.2d 1343, 1350–351 (4th Cir.1976); *E.E. O.C. v. American National Bank*, 652 F.2d 1176, 1189 (4th Cir.1981). Evidence of a general atmosphere of discrimination

may be considered with the other probative evidence. *Holsey v. Armour & Company*, 743 F.2d 199, 207–08 (4th Cir.1984). Further, the Court considers the consistence and the contradiction of the documentary and testamentary evidence and weighs the credibility of the various witnesses. In those instances in which the employer utilizes subjective factors or criteria the asserted legitimacy of the employer's reason is subjected to strict scrutiny. *Love v. Alamance Board of Education*, 757 F.2d 1504 (4th Cir.1985).

▮▮▮ (14) In order to prevail on a claim of retaliation, a plaintiff must show that he was engaged in a protected activity of which his employer was aware, that he subsequently suffered an adverse or negative employment action and that a causal link exists between the two. *See, e.g., Jones v. Lumberjack Meats, Inc.*, 680 F.2d 98 (11th Cir.1982); *Dickerson v. Metropolitan Dade County*, 659 F.2d 574 (5th Cir. 1981). An employee who has filed a charge of discrimination with the Equal Employment Opportunity Commission is not insulated from the employer's rules or policies, or from the consequences of violating the rules or policies, simply by virtue of his charge. *Jefferies v. Harris County Community Action Association*, 615 F.2d 1025 (5th Cir.1980); *Brown v. Ralston Purina Co.*, 557 F.2d 570 (6th Cir.1977).

(15) In light of those principles, and pretermitting the issue of whether the Plaintiffs established a *prima facie* case of discrimination on the basis of race, sex or retaliation,[3] the Court finds as previously discussed in the findings of fact, that the Defendant offered substantial evidence that the alleged adverse employment actions concerning the Plaintiffs were based upon legitimate, nondiscriminatory business considerations.

(16) After considering all of the evidence arguably relevant to each claim of discrimination, including the evidence of racist at-mosphere, the Court finds that the Plaintiffs failed to demonstrate that the Defendant's proffered reasons for the employment actions were pretextual. As the Court's conclusions on each claim are stated at the end of the findings of fact relating to each claim, the Court will not repeat what has already been thoroughly discussed. In summary, the Court finds that the Defendant's actions were in actual good faith. The credible evidence does not show that the Defendant permitted any non-black employee to engage in conduct similar to the Plaintiffs who refused to abide by the rules or that any similarly situated non-black employee was subject to different terms and conditions of employment.

(17) Based on the evidence, the Court concludes that the Defendant did not discriminate as alleged against any of the Plaintiffs on account of race or sex in violation of Title VII or Section 1981. Likewise, the Court does not find that the evidence warrants any inference that retaliation was a contributing factor in the treatment of the Plaintiffs by the Defendant. *Texas Department of Community Affairs v. Burdine, supra, Anderson v. Savage Laboratories, Inc.*, 675 F.2d 1221 (11th Cir. 1982); *Smalley v. Eatonville*, 640 F.2d 765 (5th Cir.1981).

(18) The Plaintiffs should be denied all relief with respect to their individual claims.

(19) The Court notes that in the *Plaintiff's Proposed Findings of Fact* the Plaintiff attempts to assert independent claims of discrimination for Willie Turner, Alvin Hall, Shelton Hines, Darryl Covington, and Robert Williams. The five individuals were witnesses at the trial. They, however, have never been joined as Plaintiffs. The Plaintiffs' basis for the novel addition of five Plaintiffs to the litigation is Fed.R. Civ.P. 15(b).

---

**3.** The Court has serious reservations about whether the Plaintiffs established a *prima facie* case on various of their claims such as, Ms. Brown's claim for discriminatory warning for her 1982 accident; Ms. Massey's claim of discriminatory elimination of her job, offered jobs and termination; Mr. Jenkins' claim of discriminatory removal of his 500 van; Mr. Cherry's claim of discriminatory warnings for missed "pick-ups"; or Mr. Ardrey's claim of discriminatory denial of a package car driver position.

 (20) Fed.R.Civ.P. 15 deals with amendment of issues and not amendment of parties. To allow five witnesses to become Plaintiffs is amendment of parties. The Plaintiffs have never moved for joinder of parties. Further, the Plaintiffs never suggested that these witnesses' testimony was being offered in support of issues not raised in the pleadings. The Court assumed their testimony was being offered to corroborate the Plaintiffs' individual claims, especially the claim of racist atmosphere, which claim permeated the entire litigation. Thus, even assuming a Rule 15 analysis is analogous, the Plaintiffs, having failed to put anyone on notice of these "new issues" and the testimony relating to issues *already* raised by the pleadings, the Court could not find the Defendant knowingly acquiesced in this amendment of pleadings.

(21) The Court, therefore, concludes that Mr. Turner, Mr. Hall, Mr. Hines, Mr. Covington, and Mr. Williams testified as witnesses only at the trial and they are not and did not become Plaintiffs in this lawsuit by their testimony.

(22) The Court shall retain jurisdiction of this action as a possible class action. The parties should meet, prepare, and submit a proposed schedule to the Court within fourteen days with respect to the outstanding class certification motion. The parties are further directed, if so desired, to make the appropriate motions pursuant to Fed.R. Civ.P. 54 for entry of judgment upon multiple claims.

(23) Each party shall bear their own costs, including attorney's fees, in this litigation.

(24) Any finding of fact which is determined also to be a conclusion of law is so deemed and any conclusion of law which is determined also to be a finding of fact is so deemed.

Based on the foregoing Findings of Fact and Conclusions of Law, IT IS, HEREBY, ORDERED, ADJUDGED, AND DECREED:

(1) That the Plaintiffs' individual claims of discrimination are DISMISSED WITH PREJUDICE;

(2) That each party shall pay their own costs, including attorney's fees; and

(3) The parties are directed to advise the Court of the outstanding matters as discussed herein within fourteen (14) days.